# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## IN ADMIRALTY

| | |
|---|---|
| In the Matter of The Complaint<br><br>of<br><br>Branson Duck Vehicles, LLC, as Owner; and Ripley Entertainment, Inc., as Owner *pro hac vice* of the STRETCH DUCK 07 for Exoneration from or Limitation of Liability | **CIVIL ACTION NO**: 6:18-cv-03339-MDH |

---

## SUGGESTIONS IN SUPPORT OF LIMITATION PLAINTIFFS' MOTION IN SUPPORT OF ADMIRALTY JURISDICTION

---

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

I.       The SD-7 Incident ................................................................................. 3

II.      Overview of Table Rock Lake ............................................................... 3

ADMIRALTY JURISDICTION ......................................................................... 5

ARGUMENT ...................................................................................................... 7

III.     The location test is met: Table Rock Lake is a navigable waterway. ............... 7

         A.      The navigability determination for Table Rock Lake must consider both
                 its current and capable uses. ................................................................ 7

         B.      Table Rock Lake is capable of use in interstate commerce. ................... 7

                 1.       The physical characteristics of Table Rock Lake demonstrate that
                          the lake is navigable. ............................................................... 9

                 2.       Evidence of existing commercial activity is not necessary to
                          support a finding that a waterway is capable of supporting
                          interstate commerce and therefore navigable. ......................... 14

         C.      Table Rock Lake is currently used in interstate commerce. ................ 16

         D.      Federal agency determinations of navigability support a finding of
                 navigability for admiralty jurisdiction purposes. ............................... 19

         E.      *Edwards v. Hurtel* is not controlling. .................................................. 20

IV.      The connection test is met: the SD-7 Incident had a potential (and actual)
         disruptive impact on maritime commerce and a sufficient connection with
         traditional maritime activity. ............................................................... 24

CONCLUSION .................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andreu v. Palmas del Mar Homeowners Ass'n, Inc.*,
  311 F. Supp. 3d 456 (D.P.R. 2018)........................................................................15

*Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*,
  709 F.3d 1055 (11th Cir. 2013) ...................................................................8, 9, 15

*Aramark Leisure Servs., Inc. Limitation Proceedings Runabout*,
  No. 03-CV-1030, 2003 WL 24040290, 2005 A.M.C. 366, 367 (D. Ariz. Dec.
  18, 2003) ...........................................................................................................9, 15

*In re Aramark Sports & Entm't Servs.*,
  LLC, No. 2:09-CV-637-TC, 2010 WL 770065 (D. Utah Mar. 5, 2010) ...................9

*Bendet v. Sandoz Pharm. Corp.*,
  308 F.3d 907 (8th Cir. 2002) ...............................................................................21

*Blake Marine Grp. v. Car Val Inv'rs LLC*,
  829 F.3d 592 (8th Cir. 2016) .................................................................................5

*Bond v. Doig*,
  433 F. Supp. 243 (D.N.J. 1977) (Greenwood Lake bordering New York and
  New Jersey)..........................................................................................................10

*Brevard Cty. v. Blasky*,
  875 So. 2d 6 ........................................................................................................20

*Briggs v. Jupiter Hills Lighthouse Marina*,
  9 So. 3d 29 (Fla. Dist. Ct. App. 2009) ......................................................12, 13, 21

*Charnis v. Watersport Pro, LLC*,
  No. 2:07-C V-00623-RLHGWF, 2009 WL 2581699 (D. Nev. May 1, 2009) .........9

*Cobb v. Aramark Sports & Entm't Servs.*,
  LLC, 933 F. Supp. 2d 1295 (D. Nev. 2013) .........................................................9

*Donais v. Green Turtle Bay, Inc.*,
  No. 5:10-CV-167-TBR, 2012 WL 399160 (W.D. Ky. Feb. 7, 2012)....................10

*Duke v. United States*,
  711 F. Supp. 332 (E.D. Tex. 1989) .......................................................................12

*Edwards. Lane v. Peterson*,
  899 F.2d 737 (8th Cir. 1990) ...............................................................................20

Case 6:18-cv-03339-MDH   Document 188   Filed 07/08/19   Page 3 of 34

*Edwards v. Hurtel*,
717 F.2d 1204, 1205 (8th Cir. 1983), *on reh'g*, 724 F.2d 689 (8th Cir. 1984).................20, 22

*Edwards v. Hurtel*,
717 F.2d 1204 (8th Cir. 1983) ........................................................................................9, 23

*In re Everglades Island Boat Tours, LLC*,
484 F. Supp. 2d 1259 (M.D. Fla. 2007)........................................................................18

*Finneseth v. Carter*,
712 F.2d 1041 (6th Cir. 1983) ................................................................................ *passim*

*George v. Beavark, Inc.*,
402 F.2d 977 (8th Cir. 1968) ..........................................................................................6

*Great Am. Ins. Co. of New York v. Miller Marine Yacht Servs., Inc,*.
No. 5:05CV175 RS/AK, 2006 WL 1776985 (N.D. Fla. June 26, 2006) ...............................24

*Guillory v. Outboard Motor Corp.*,
956 F.2d 114 (5th Cir. 1992) ..........................................................................................5

*H2O Houseboat Vacations Inc. v. Hernandez*,
103 F.3d 914 (9th Cir. 1996) ..........................................................................................9

*Hartman v. United States*,
522 F. Supp. 114 (D.S.C. 1981).............................................................................9, 16, 17, 19

*Hoopengarner v. United States*,
270 F.2d 465 (6th Cir. 1959) ........................................................................................10

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)................................................................................................ *passim*

*Johnson v. Anderson*,
No. 3:06CV782 WWE, 2007 WL 735777 (D. Conn. Mar. 2, 2007)......................................10

*LeBlanc v. Cleveland*,
198 F.3d 353 (2d Cir. 1999).....................................................................................6, 7, 14

*Livingston v. United States*,
627 F.2d 165 (8th Cir. 1980) ...............................................................................6, 7, 14, 21

*Lockheed Martin Corp. v. Morganti*,
412 F.3d 407 (2d Cir. 2005)............................................................................................8

*Marshall v. Wellcraft Marine, Inc.*,
103 F. Supp. 2d 1099 (S.D. Ind. 1999) ...........................................................................24

*Moeller v. Mulvey*,
    959 F. Supp. 1102 (D. Minn. 1996) .................................................................18

*Mullenix v. United States*,
    984 F.2d 101 (4th Cir. 1993) ...........................................................10, 12, 14

*Mut. Benefit Health & Accident Ass'n v. Bowman*,
    99 F.2d 856 (8th Cir. 1938) .................................................................21

*Polly v. Estate of Carlson*,
    859 F. Supp. 270 (E.D. Mich. 1994) .......................................................24

*Price v. Price*,
    929 F.2d 131 (4th Cir. 1991) .......................................................... *passim*

*Reneau v. Shoreline Marine Sightseeing Co.*,
    No. 84 C 10622, 1986 WL 1589 (N.D. Ill. Jan. 17, 1986) .....................................26

*Richards v. Blake Builders Supply, Inc.*,
    528 F.2d 745 (4th Cir. 1975) ...........................................................9, 15

*Richardson v. Foremost Ins. Co.*,
    641 F.2d 314 (5th Cir. 1981), *aff'd*, 457 U.S. 668 (1982) .....................................15

*Sanders v. Placid Oil Co.*,
    861 F.2d 1374 (5th Cir. 1988) .................................................................11

*Seymour v. United States*,
    744 F. Supp. 1161 (S.D. Ga. 1990) ...........................................................9

*Sinclair v. Soniform, Inc.*,
    935 F.2d 599 (3d Cir. 1991) ...........................................................24, 25, 26

*Sisson v. Ruby*,
    497 U.S. 358 (1990) .................................................................24

*Smith v. The Abandoned Vessel*,
    610 F. Supp. 2d 739 (S.D. Tex. 2009) .......................................................13

*St. Hilaire Moye v. Henderson*,
    496 F.2d 973 (8th Cir. 1974) .................................................................26

*Stallworth v. McFarland*,
    350 F. Supp. 920 (W.D. La. 1972) (Toledo Bend Reservoir bordering
    Louisiana and Texas) .................................................................9

*State of Arizona v. State of California*,
    283 U.S. 423 (1931) .................................................................20

*In re Strahle*,
    250 F. Supp. 2d 997 (N.D. Ind. 2003) .................................................................12

*Straznicky v. Desert Springs Hosp.*,
    642 F. Supp. 2d 1238 (D. Nev. 2009) .................................................................23

*Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts*,
    921 F.2d 775 (8th Cir. 1990) ..................................................... *passim*

*Topps-Toeller, Inc. v. City of Lansing*,
    47 Mich. App. 720 (1973)..................................................................21

*United States v. Appalachian Elec. Power Co.*,
    311 U.S. 377 (1940)..........................................................................20

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.*,
    201 F.2d 833 (5th Cir. 1953) ...........................................................10

*Wilder v. Placid Oil Co.*,
    611 F. Supp. 841 (W.D. La. 1985), *aff'd sub nom. Sanders v. Placid Oil Co.*,
    861 F.2d 1374 (5th Cir. 1988) ..............................................10, 19

**Statutes**

18 U.S.C. § 1115.................................................................................................20

28 U.S.C. § 1333(1) .............................................................................................5

33 U.S.C. § 403....................................................................................................19

46 U.S.C. § 30505................................................................................................5

46 U.S.C. § 30502................................................................................................5

**Other Authorities**

33 C.F.R. § 329.4................................................................................................19

Limitation Plaintiffs Branson Duck Vehicles, LLC and Ripley Entertainment, Inc. (collectively "Limitation Plaintiffs"), in support of their Motion in Support of Admiralty Jurisdiction, suggest as follows:

## INTRODUCTION

STRETCH DUCK 7 ("SD-7") was carrying passengers for hire on Table Rock Lake—an interstate lake between Missouri and Arkansas—on July 19, 2018, when it encountered heavy weather and sank. Admiralty jurisdiction over maritime torts exists if the alleged tort occurs on navigable waters, has a potentially disruptive impact on maritime commerce, and results from an activity having a substantial relationship to traditional maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). Each of these three requirements is satisfied.

As to the first requirement, waterways are "navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870). While actual commercial activity is not required to establish navigability, not only is Table Rock Lake susceptible of commercial activity as an interstate lake, substantial actual commercial activity is occurring on Table Rock Lake. Furthermore, the "susceptible of use" requirement focuses on whether the body of water is physically capable of use in interstate commerce. The physical characteristics of Table Rock Lake demonstrate that it is susceptible of being used for interstate commerce, and several of Limitation Plaintiffs' alleged experts and fact witnesses admit as much.

From the jurisdictional evidence submitted, it appears that Claimants' will argue that because Table Rock Lake is "primarily" a recreational lake, it does not meet the navigability standard for admiralty jurisdiction. This argument is legally and factually deficient. Both circuit

and district courts have consistently held that so-called "recreational" lakes are navigable. Likewise, courts consistently hold that interstate lakes (absent obstruction) are inherently susceptible of use in interstate commerce based on their physical characteristics alone—holdings supported by simple logic, *i.e.* the waterway itself spans two states and vessels are capable of traveling on the water between those states. Notably, the economic feasibility of potential commercial shipping, or connectivity to other bodies of water, is not required or relevant factors under *The Daniel Ball* standard. Therefore, the first requirement for exercising admiralty jurisdiction is satisfied because interstate commerce is taking place on Table Rock Lake and because Table Rock Lake is susceptible of being used for interstate commerce.

The second and third requirements are likewise satisfied. Vessels or passengers in distress have a potentially disruptive effect on maritime commerce. SD-7 was a vessel in distress. Finally, carrying passengers for hire—the activity SD-7 was engaged in at the time of its sinking—is one of the paradigmatic examples of traditional maritime activity.

*Edwards v. Hurtel* is not dispositive and does not bind this Court. *Edwards* was decided roughly thirty-five years ago on the basis of judicially-noticed facts that went unchallenged on appeal. Federal admiralty jurisdiction turns on *contemporary* navigability in fact, and the failure to present evidence of navigability in *Edwards* does not indefinitely control the existence of admiralty jurisdiction on Table Rock Lake. Rather, the facts currently before the Court demonstrate that not only is Table Rock Lake presently capable of use in interstate commerce—making it a navigable waterway—but that substantial commercial activity is actually occurring. Those facts were not presented to and never considered by the Edwards court. Thus, under the factual record of this case, Table Rock Lake is both capable of use in interstate commerce and

actually used in interstate commerce. It is therefore contemporarily navigable in fact. Accordingly, this Court should find it has admiralty jurisdiction over this matter.

FACTUAL BACKGROUND

## I.    The SD-7 Incident

STRETCH DUCK 7 was "an amphibious vehicle that took passengers on tourist excursions through Branson on land as well as in the waters of Table Rock Lake." Exhibit A, Agency Documents (NTSB Preliminary Report, at p.2). On July 19, 2018, while carrying 29 passengers and two crew members, SD-7 sank during a storm while on Table Rock Lake, resulting in the deaths of 17 persons (the "Incident" or "SD-7 Incident"). *Id*. at p.1.

## II.    Overview of Table Rock Lake

Table Rock Lake is an interstate lake located in southwest Missouri and northwest Arkansas. *See* Doc. 154, Declaration of Marc Patrick Curry, at 3 (hereinafter "Curry at __"); *See generally* Doc. 154-V1, Limitation Plaintiffs Videos 1 through 7.[1] From the location where SD-7 sank, vessels may freely navigate north (and west) to various marinas and other locations and eventually cross the southern Missouri border into Arkansas to Holiday Island Marina, and other locations in Arkansas, located on the southwestern side of Table Rock Lake. *See* Doc. 155, Affidavit of Captain Joseph F. Killian, at 5 (hereinafter "Killian at __"). Vessels can also freely navigate directly to the south from the location where SD-7 sank, to various marinas and other locations and eventually cross the border into Arkansas to Cricket Creek Marina and other locations. Killian at 4.

At normal levels, Table Rock Lake has roughly 745 miles of shoreline, a total water surface area of approximately 43,100 acres, and a maximum depth of 220 ft. *Id*.; Curry at 4. There are three primary areas where Table Rock Lake crosses the border between Missouri and

---

[1] These videos were previously submitted in disk form. *See* Doc. 154-7.

Arkansas. Curry at 4. The first border crossing, on the east end of the lake, is approximately 790 ft. wide at the border, and a significant portion of the channel is between 25 and 70 feet deep. *Id*. The second crossing, on the west end of the lake, is approximately 667 ft. wide at the border, with a significant portion of the waterway between 10 and 35 feet deep. *Id*. at 6. The third crossing is centrally located in the Marshall Branch of the lake. *Id*. at 8. No natural or artificial obstructions impede shipping or vessel traffic at any of the three border crossings. *Id*. at 4-8.

Table Rock Lake and its surrounding public use areas generally have over seven million visitors a year, including four million boaters. *Id*. at 9. There are 16 commercial marinas on the lake (two in Arkansas and fourteen in Missouri) with approximately 133 commercial docks and 4,395 commercial vessel slips. *Id*. at 26.[2] The lake also has 1,894 private docks and 13,388 private vessel slips. *Id*. at 9. In an average year, visitors to Table Rock Lake bring approximately $321 million in spending to the local economy, generating approximately $71 million in income for local citizens. *Id*. at 9–10.

In addition to significant recreational vessel traffic, a variety of commercial vessels operate on Table Rock Lake. Three U.S. Coast Guard inspected passenger vessels carry tourists from various States across the United States on sightseeing cruises around the lake. The LADY LIBERTY, with dimensions of 60 ft. in length, 18 ft. in breadth, and 5 ft.in depth, can carry up to 45 passengers for hire. *Id*. at 10. The BRANSON BELLE is 195 ft. in length and carries up to 700 passengers for hire. *Id*. at 12–13. The SPIRIT OF AMERICA, with dimensions of 48 ft. in length, 28 ft. in breadth, and 7.3 ft. in depth, can carry up to 49 passengers for hire. *Id*. at 14. Other commercial vessels operating on the lake include deck barges, crane barges, dive boats, and vessels used by commercial marine assistance providers. *Id*. at 18–26. Both recreational

---

[2] The Curry Declaration contains typographical errors on pages 26 and 36, respectively suggesting there are thirteen or sixteen commercial marinas in Missouri. For clarification, as listed in Table 1 (pp. 36-37) of the Declaration, there are fourteen commercial marinas in Missouri, with a total of sixteen commercial marinas on Table Rock Lake.

vessels, including those rented at commercial marinas on the lake, and commercial vessels, including marine construction barges and other vessels in support of marine construction and repair activities, and the LADY LIBERTY, navigate across state lines to various parts of Table Rock Lake in Missouri and Arkansas. *Id*. at 10, 18, 38-40.

## ADMIRALTY JURISDICTION

Article III, § 2 of the United States Constitution and 28 U.S.C. § 1333(1) confer subject matter jurisdiction over admiralty cases to the district courts. The Limitation of Liability Act, which applies to "vessels used on lakes or rivers or in inland navigation," *see* 46 U.C § 30502, creates a procedure in admiralty for resolving claims in one forum and limits vessel owner's liability for certain maritime damages to the post-incident value of the involved vessel and its pending freight under certain circumstances. *See* 46 U.S.C. § 30505. But the Limitation Act itself does not provide an independent basis for federal jurisdiction, instead, "the Act's reach is only coextensive with that of admiralty jurisdiction." *Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts*, 921 F.2d 775, 780 (8th Cir. 1990); *see also Guillory v. Outboard Motor Corp.*, 956 F.2d 114, 115 (5th Cir. 1992) ("The Limitation of Liability Act does not confer jurisdiction upon federal courts. That must come from our admiralty jurisdiction under U.S. Const. art. III, § 2 and 28 U.S.C. § 1333(1).").

Thus, "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). The Supreme Court has termed this two-party inquiry the "location test" and the "connection test." *Id.*; *see also Blake Marine Grp. v. Car Val Inv'rs LLC*, 829 F.3d 592, 597 (8th Cir. 2016) (applying *Grubart* test).

The Location Test: "A court applying the location test must determine whether the tort occurred on navigable water." *Grubart*, 513 U.S. at 534. Navigable waters are defined as waters that are "navigable in fact," a standard first set forth in *The Daniel Ball*, 7 U.S. (10 Wall.) 557 (1870). *George v. Beavark, Inc*., 402 F.2d 977, 979 (8th Cir. 1968) (navigability standard dates back to *The Daniel Ball*). "Virtually every circuit that has invoked a definition of navigable waters in the context of determining admiralty jurisdiction has likewise resorted to the definition in *The Daniel Ball*." *Price v. Price*, 929 F.2d 131, 134 (4th Cir. 1991). *See also LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999).[3]

In *The Daniel Ball*, the Supreme Court held:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

77 U.S. at 563; *see also Livingston v. United States*, 627 F.2d 165, 170 (8th Cir. 1980) ("federal admiralty jurisdiction turns on contemporary navigability in fact"); *LeBlanc*, 198 F.3d at 359 (A waterway "is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water.").

The Connection Test: This test includes two separate components:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

---

[3] "Navigability is a term subject to different definitions depending upon the context of a case. In some cases the term has a different meaning from that expressed in admiralty cases." *Three Buoys*, 921 F.2d at 778.

*Grubart*, 513 U.S. at 534 (internal quotations and citations omitted). Claims arising from the SD-7 Incident meet all elements of the location and connection tests.

## ARGUMENT

**III.    The location test is met: Table Rock Lake is a navigable waterway.**

      A.    <u>The navigability determination for Table Rock Lake must consider both its current and capable uses.</u>

Table Rock Lake is navigable in fact because it is currently being used for interstate commerce or is capable of use in interstate commerce. *See Price*, 929 F.2d at 134 ("The definition has two disjunctive aspects. The waters are navigable if they are currently being used as a highway of commerce *or* if they are susceptible of being so used.") (emphasis in original); *Finneseth v. Carter*, 712 F.2d 1041, 1044 (6th Cir. 1983) (A "water body is navigable in fact if it is used or susceptible for use as a highway of commerce.").[4] Table Rock Lake satisfies both of these disjunctive requirements and is therefore navigable in fact.

      B.    <u>Table Rock Lake is capable of use in interstate commerce.</u>

The navigability standard of whether a body of water is susceptible of use as a highway of commerce is one of present capability. The susceptibility standard does not consider how the body of water is actually used or even its historic use. *See Livingston*, 627 F.2d at 170 (the concept of navigability describes "a *present capability* of waters to sustain commercial shipping") (emphasis added); *Three Buoys*, 921 F.2d at 778 ("the standard is one of 'contemporary navigability in fact'"); *LeBlanc*, 198 F.3d at 358 ("[E]very circuit court to confront the question has rejected the historic navigability jurisdictional test when determining admiralty jurisdiction.").

---

[4] While part of the opinion in *Finneseth* appears to critique the navigability standard set forth in *Livingston, see* 712 F.2d at 1045, the Eighth Circuit has subsequently clarified this misreading of *Livingston*, and stated that "*Finneseth* is not actually contrary to *Livingston*." *Three Buoys*, 921 F.2d at 778 n.4.

Further, courts assessing capability look to the physical, rather than economic, characteristics of the waterway. For example, in considering the navigability of Cayuga Lake (connected to Lake Ontario), the Second Circuit rejected the argument "that the topography of Cayuga Lake and the economic conditions of the surrounding areas make commercial shipping unprofitable, and that the lake is therefore not susceptible of being used for commercial shipping, and thus is not navigable." *Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 412 (2d Cir. 2005).[5] It noted:

> The question of whether it would be economically difficult to profitably use Cayuga Lake commercially is a fundamentally different question that does not affect whether the lake is capable of being used for commerce . . . Because Cayuga Lake is physically capable of supporting shipping, it is possible at any time for an interstate commercial vessel to enter the lake . . . Any such shipping would give rise to the same federal interests as interstate commercial shipping anywhere else. If we were now to withdraw federal jurisdiction from Cayuga Lake, we would have to extend it again the moment that an interstate commercial ship entered the lake. In contrast, basing such jurisdictional changes on major events like damming or other physical alterations that make it physically impossible for a commercial vessel to travel on the waterway presents few difficulties.

*Id*. at 413.

Likewise, the Eleventh Circuit rejected "a test for navigability that looks to whether there is evidence of current or planned commercial activity on the waterway." *Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*, 709 F.3d 1055, 1060–61 (11th Cir. 2013). Instead, while recognizing the navigability standard "may expand admiralty jurisdiction into waterways that may never be used for commercial maritime activities[,]" the court ultimately held: "If the waterway is capable of being used in commerce, that is a sufficient threshold to conclude that it is navigable for admiralty jurisdiction purposes." *Id*. at 1061–62 (internal quotations omitted).

---

[5] The Court in *Lockheed Martin Corp*. applied *The Daniel Ball's* navigable in fact test to the situs requirement of the Longshore and Harbor Workers' Compensation Act ("LHWCA"). *See also* Eighth Circuit's Manual of Model Civil Jury Instructions at 17.26 (using *The Daniel Ball's* navigability definition for LHWCA cases and additionally citing to *Three Buoys* and *Livingston*).

1.      *The physical characteristics of Table Rock Lake demonstrate that the lake is navigable.*

Absent physical obstructions (such as dams or waterfalls) or other geographical limitations (such as an insufficient depth) that impede travel, interstate lakes—*i.e.* those that span two states or a state and another country—are by definition capable of use in interstate commerce. Courts as a result have almost universally held that interstate lakes like Table Rock Lake are navigable waters:[6]

- *Cobb v. Aramark Sports & Entm't Servs.*, LLC, 933 F. Supp. 2d 1295, 1298 (D. Nev. 2013) (Lake Tahoe bordering Nevada and California)

- *Finneseth*, 712 F.2d at 1047 (Dale Hollow Lake bordering Kentucky and Tennessee)

- *Charnis v. Watersport Pro, LLC*, No. 2:07-C V-00623-RLHGWF, 2009 WL 2581699 (D. Nev. May 1, 2009) (Lake Mead bordering Nevada and Arizona)

- *Price*, 929 F.2d at 134 (Kerr Reservoir bordering North Carolina and Virginia)

- *Hartman v. United States*, 522 F. Supp. 114, 117 (D.S.C. 1981) (Lake Wylie bordering North Carolina and South Carolina)

- *Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745, 747 (4th Cir. 1975) (Lake Gaston bordering North Carolina and Virginia)

- *Stallworth v. McFarland*, 350 F. Supp. 920 (W.D. La. 1972) (Toledo Bend Reservoir bordering Louisiana and Texas)

- *Aramark Leisure Servs., Inc. Limitation Proceedings Runabout*, No. 03-CV-1030, 2003 WL 24040290, 2005 A.M.C. 366, 367 (D. Ariz. Dec. 18, 2003) (Lake Powell bordering Utah and Arizona); *In re Aramark Sports & Entm't Servs.*, LLC, No. 2:09-CV-637-TC, 2010 WL 770065, at *1 (D. Utah Mar. 5, 2010) (accord)

- *H20 Houseboat Vacations Inc. v. Hernandez*, 103 F.3d 914, 916 (9th Cir. 1996) (Lake Havasu bordering California and Arizona)

---

[6] Limitation Plaintiffs are aware of only two cases in which an unobstructed interstate lake was found non-navigable. *See Seymour v. United States*, 744 F. Supp. 1161 (S.D. Ga. 1990) (Strom Thurmond Lake bordering Georgia and South Carolina); *Edwards v. Hurtel*, 717 F.2d 1204, 1205 (8th Cir. 1983) (Table Rock Lake). Neither are compelling.  The reasoning in *Seymour* has been rejected by the Eleventh Circuit as inconsistent with binding precedent. *See Aqua Log*, 709 F.3d at 1059 (reversing district court opinion that found waterways non-navigable). *Edwards* is distinguishable for the reasons discussed in Section I.E.

- *Donais v. Green Turtle Bay, Inc.*, No. 5:10-CV-167-TBR, 2012 WL 399160, at *4 (W.D. Ky. Feb. 7, 2012) (Lake Barkley bordering Kentucky and Tennessee)

- *Hoopengarner v. United States*, 270 F.2d 465, 471 (6th Cir. 1959) (Lake St. Clair bordering Michigan and Ontario)

- *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 201 F.2d 833, 835 (5th Cir. 1953) (Lake Texoma bordering Texas and Oklahoma)

- *Bond v. Doig*, 433 F. Supp. 243, 249 (D.N.J. 1977) (Greenwood Lake bordering New York and New Jersey)

Conversely, lakes that are purely *intrastate* have been found to not meet the location test. *See Three Buoys*, 921 F.2d at 779 ("[W]e conclude that the purely intrastate shipping which can be maintained on the lake, which is located entirely in the State of Missouri, is insufficient to make it a navigable waterway for interstate commerce purposes to sustain admiralty jurisdiction in the federal courts."); *Johnson v. Anderson*, No. 3:06CV782 WWE, 2007 WL 735777, at *2 (D. Conn. Mar. 2, 2007) ("The location test is not met in this case because Candlewood Lake is a lake located entirely within the State of Connecticut.").[7]

Table Rock Lake is an interstate lake. It spans the Missouri-Arkansas border in three separate locations, two of which (the east and west end crossings) are easily traversed by commercial craft. Curry at 4–8; Killian at 3–6. Notably, there are no artificial or natural obstructions that prevent a commercial vessel from traveling between Missouri and Arkansas at either the east or west end crossings as demonstrated by these pictures of those locations:

---

[7] Some courts have found intrastate bodies of water to be navigable. *Wilder v. Placid Oil Co.*, 611 F. Supp. 841, 847 (W.D. La. 1985), *aff'd sub nom. Sanders v. Placid Oil Co.*, 861 F.2d 1374 (5th Cir. 1988) ("The Little River, including Catahoula Lake, is neither landlocked nor incapable of commerce. The Court finds the accident involved in this case is within its admiralty jurisdiction."); *Mullenix v. United States*, 984 F.2d 101, 104 (4th Cir. 1993) ("The Potomac River [at the accident site] is wholly within Maryland but not incapable of supporting the movement of commerce between Maryland and West Virginia, making it a navigable waterway for purposes of determining admiralty jurisdiction.").



Curry at 5, 8 (Figures 3 and 9); *see also* Limitation Plaintiffs Videos 2-4, 7. At the east end crossing, a significant portion of the 790 ft. wide waterway is between 25 and 70 ft. deep, and at the west end crossing, a significant portion of the 667 ft. wide waterway is between 10 and 35 ft. deep. Curry at 4, 6. Therefore, at either border crossing, commercial vessels can physically navigate from Missouri to Arkansas or vice versa. "[B]arges and other types of vessels – of at least up to 150 feet long, and at least up to 40 feet wide, and with drafts of at least 8 feet – could freely and safely navigate from the general vicinity of Branson Belle's normal docking location to the Holiday Island Marina in Arkansas, and the Cricket Creek Marina in Arkansas." Killian at 6; *see also Sanders v. Placid Oil Co.*, 861 F.2d 1374, 1378 (5th Cir. 1988) (affirming navigability finding for Catahoula Lake and noting that "[i]addition to determining navigability by reference to the water level of the Little River and Catahoula Lake, the district court reviewed . . . [affidavit testimony that an individual] piloted a 35 by 110-foot barge, with 3-foot draft when empty, throughout Catahoula Lake"). Further, several of Claimants' witnesses admit that commercial vessels could navigate these crossings. *See* Exhibit B, Excerpts of Deposition Transcripts (Donelan at 26:8-28:22, 46:9-18; Cameron at 96:3-16; 97:4-20; Hathaway at 29:17-30:5, 42:19-44:2).[8]

---

[8] Full copies of these transcripts are attached to Limitation Plaintiffs' Suggestions in Support of Motion to Exclude the Opinions of Cameron, Harris, Hall and Donelan, as well as Limitation Plaintiffs' Suggestions in Support of Motion to Strike the Affidavits of Barr and Hathaway, both of which have been filed on July 8, 2019.

When vessels of a certain size can successfully travel between states on a body of water, then commercial craft can do the same. The Sixth Circuit reasoned that although the only maritime traffic on Dale Hollow Lake was recreational, "the fact that Dale Hollow Lake is currently suitable for maritime traffic by large pleasure craft" supported the conclusion that the lake could support commercial maritime traffic. *Finneseth* 712 F.2d at 1042, 1044–45. In *Mullenix*, when finding admiralty jurisdiction to exist, the Fourth Circuit noted: "[a]lthough the record gives no indication that the Potomac River was supporting commercial shipping at the time of Mullenix' accident, the river sustained heavy traffic from sightseeing cruises and ferries transporting passengers to and from Maryland, Virginia, and West Virginia." 984 F.2d at 104 n.3. Other courts have adopted this reasoning. *In re Strahle*, 250 F. Supp. 2d 997 (N.D. Ind. 2003) ("Today, the Tippecanoe River is used by recreational boaters, demonstrating its suitability for use for the simpler forms of trade in interstate commerce."); *Duke v. United States*, 711 F. Supp. 332 (E.D. Tex. 1989) ("The plaintiff has contested navigability in part on the lack of commercial activity on Booth's Bayou. Even assuming that the traffic on the bayou was not commercial at the relevant time, it is evident that the bayou was physically capable of being used as a highway of commerce."); *Briggs v. Jupiter Hills Lighthouse Marina*, 9 So. 3d 29, 33–34 (Fla. Dist. Ct. App. 2009) ("We can find no support for plaintiff's position that a waterway is navigable for purposes of admiralty jurisdiction only if the waterway can support 'ocean going commercial vessels.' . . . In fact . . . relatively large boats were on the Loxahatchee on the day of the accident and that a boat approximately thirty feet long created the wake which caused the accident.").

The vessels currently operating on Table Rock Lake demonstrate it is capable of use (and is being used) in interstate commerce between Missouri and Arkansas. For example, the LADY

LIBERTY is a 60 foot U.S. Coast Guard inspected vessel that can carry up to 45 passengers for hire. Curry at 10. The LADY LIBERTY is primarily based out of Long Creek Marina in Missouri, and carries passengers both north of the Long Creek Bridge and south into Arkansas:

 

Curry at 10–12 (Figures 12 and 14);[9] Limitation Plaintiffs Video 4. *See Smith v. The Abandoned Vessel*, 610 F. Supp. 2d 739, 751–52 (S.D. Tex. 2009) (finding Melon Lake, an intrastate body of water connected to the Gulf of Mexico, navigable based in part on the court's viewing a video of an airboat traveling unimpeded through the tributary). Fitzco, which provides a variety of marine services—including marine construction, salvage and recovery of stranded and sunken vessels, and yacht and houseboat transport—likewise operates its vessels and barges across state lines to perform work in both Missouri and Arkansas. Curry at 18. Similarly, houseboats—between 60 and 80 feet in length—are rented in Missouri for use on Table Rock Lake, and are capable of navigating throughout the lake, including in both Missouri and Arkansas. *Id*. at 43; Killian at 6.

While Table Rock Lake lies between the Beaver Dam in Arkansas and the Table Rock Dam in Missouri, neither dam provides any obstruction to interstate travel, as each is located along the outer edge of the lake distant from any of the lake's border crossings.[10] As explained by the Second Circuit, "cases in which circuit courts have found dammed waterways navigable for jurisdictional purposes are easily distinguished by the fact that the waterway in question

---

[9] The yellow sign directly behind/above the LADY LIBERTY in the right-hand photograph is the Missouri-Arkansas border sign. Curry at 12, Figure 14.
[10] *See* https://webapp.navionics.com/#boating@10&key=ixb~EjfuxP

formed the border between two states, thereby rendering it capable of supporting interstate commerce despite the existence of artificial dams blocking downstream flow." *LeBlanc*, 198 F.3d at 359.[11]

Table Rock Lake fits the paradigmatic example of a dammed interstate waterway that is navigable for jurisdictional purposes.

2. *Evidence of existing commercial activity is not necessary to support a finding that a waterway is capable of supporting interstate commerce and therefore navigable.*

As detailed in Section I.C below, actual commercial activity is occurring on Table Rock Lake today. But even without evidence of that actual commercial activity, no existing commercial activity is necessary to find Table Rock Lake navigable. "Evidence that a body of water is currently being used for commercial navigation may support the conclusion that it is navigable. However, merely because a body of water is not currently being used for commercial navigation does not require the opposite conclusion, that it is not navigable. Even in the ordinary meaning of the word, navigable is significantly broader and encompasses the notion that a body of water is capable of being navigated." *Price*, 929 F.2d at 134. *See also Mullenix*, 984 F.2d at 104 ("Current uses of the waterway go to the issue of navigability but are not conclusive, so a purely recreational waterway can be navigable for admiralty purposes.").

The "susceptible of commercial activity" standard promotes consistency and predictability in the application of admiralty law. As the Eleventh Circuit stated, "a test for navigability that requires actual commercial activity is unpredictable and is therefore not conducive to maritime commerce. If actual commercial activity is the test, the application of

---

[11] *Compare Finneseth*, 712 F.2d at 1044 ("In this case Dale Hollow Lake clearly meets the requirement that the lake be an *interstate* highway for commerce because it straddles Kentucky and Tennessee. Because the interstate nexus is satisfied in this manner, it is not probative that maritime traffic on the lake is prevented from traveling downstream by the lockless dam.") (emphasis in original) *with Livingston*, 627 F.2d at 168 (Norfolk River held non-navigable because construction of dam changed the character of river, causing it at times to be "very shallow" and "making it impossible to travel by boat without portaging in some areas.").

14

substantive maritime law becomes contingent on the presence or absence of commercial activity . . . . A test that requires evidence of actual or likely commercial activity fails to provide the predictability that encourages maritime commerce." *Aqua Log*, 709 F.3d at 1061.

This standard is universally applied. As observed by the Fourth Circuit, when examining the Kerr Reservoir adjoining North Carolina and Virginia:

> The Kerr Reservoir . . . is used almost entirely for pleasure boating. The parties have pointed to one professional fishing guide who makes his living chartering boats and services on the lake. All other commercial activity supports the recreational use. The only municipality on the reservoir, Clarksville, Virginia, informed the parties that its two large manufacturing concerns, Burlington Industries (a textile manufacturer) and Russell Stover (a candy maker), ship their products exclusively over land.

*Price*, 929 F.2d at 134. The Court concluded that although the lake "may not currently be used for commercial navigation, because it is capable of being used for purposes of transportation and commerce by customary modes of trade and travel on water, it is a navigable waterway for purposes of determining admiralty jurisdiction." *Id.* at 135. When finding navigability of the Dale Hollow Lake between Kentucky and Tennessee, the Sixth Circuit noted that "[t]he only maritime traffic which presently operates on the lake is in the form of pleasure craft." *Finneseth*, 712 F.2d at 1042; *see also Richardson v. Foremost Ins. Co.*, 641 F.2d 314, 316 (5th Cir. 1981), *aff'd*, 457 U.S. 668 (1982) ("We note additionally from the record that the place where the accident occurred is seldom, if ever, used for commercial activity. That does not cause us to vary from our holding."); *Richards*, 528 F.2d at 747 ("There is nothing to suggest that Lake Gaston, though navigable, supports any substantial commercial activity."); *Aramark Leisure Servs.*, 2003 WL 24040290, 2005 A.M.C. at 367 ("The crash occurred on Lake Powell, which forms part of the border of Utah and Arizona. It could be used for commercial shipping. *It is true that there is no evidence of commercial shipping on Powell. However, its potential use as a waterway for commerce is sufficient*.") (emphasis added); *Andreu v. Palmas del Mar Homeowners Ass'n, Inc.*,

311 F. Supp. 3d 456, 460 (D.P.R. 2018) ("Commercial vessels, should they wish to, could use the area for trade or travel . . . There is no need for present, actual commercial activity; it is enough that it could occur. Because there is potential for the waterway at issue to be used in such a manner, it is navigable for admiralty jurisdiction purposes."); *Hartman*, 522 F. Supp. at 116–17 ("Lake Wylie is an interstate body of water, comprising a portion of the border between the two Carolinas . . . it is a sizeable body, capable of promoting travel and commerce between the two states. That it actually does so at the present time is not shown on the record . . . . Lake Wylie is susceptible of being traversed by commercial craft between states and is therefore navigable for purposes of invoking admiralty jurisdiction.").

Table Rock Lake is an interstate lake upon which commercial vessels are capable of traveling between Missouri and Arkansas in interstate commerce. Evidence of existing commercial activity is not necessary, but as demonstrated in the next section, substantial actual commercial activity is in fact occurring on Table Rock Lake. Therefore, the lake is a navigable waterway for the purpose of admiralty jurisdiction.

      C.      <u>Table Rock Lake is currently used in interstate commerce.</u>

Table Rock Lake has multiple commercial ventures operating on its waters which demonstrate that interstate commerce is in fact occurring and that the lake has the capacity to support interstate commerce. Therefore, the lake is navigable under *The Daniel Ball* standard.

Seven dock construction and repair companies operate on Table Rock Lake. Curry at 25. MaricorpU.S., one of the largest dock construction firms in the country, operates a dock construction and repair business on Table Rock Lake utilizing interstate commerce. *Id*. MaricorpU.S., normally constructs and install docks in separate phases. *Id*. at 26. First, metal cutting and fabrication of dock components is usually performed at facilities on land and then transports the dock components to one of three sites near Table Rock Lake where the docks are

assembled. *Id*. Then, once assembled, the docks are loaded and transported by barge and other vessels on the waters of Table Rock Lake to their eventual installation at a location in either Arkansas or Missouri. *Id*. Therefore, MaricorpU.S. engages in interstate commerce on Table Rock Lake. The other dock construction and repair companies operating on Table Rock Lake similarly construct and deliver docks and materials by vessel, and repair docks and related equipment for both residential and commercial customers, on Table Rock Lake in both Arkansas and Missouri. *Id*. at 26.

Two nationwide commercial marine assistance operators, Sea Tow and Boat/US, operate on Table Rock Lake in both Missouri and Arkansas. *Id*. at 14–17. Sea Tow delivers fuel to stranded vessels, jumpstarts depleted batteries for vessels, provides towing services, and provides recovery and salvage services for sunken or stranded vessels on the lake. *Id*. at 15. Sea Tow operates six vessels that are capable of rendering assistance to all parts of Table Rock Lake accessible by boat. *Id*. Likewise, Boat/US operates three vessels on Table Rock Lake and provides the following services on the lake: towing, soft ungroundings, battery jumps, fuel delivery, dock repair, salvage assistance for stranded or sunken vessels, and oil spill cleanup. *Id*. at 17.

Several dive excursion companies also operate on the lake. Some companies, such as White River Dive Company and DiVentures Springfield, LLC, focus on services to scuba divers including training, certification, equipment sales and service, and guided dive excursions. *Id*. at 23–25. These dive companies transport customers to dive locations on Table Rock Lake in both Missouri and Arkansas. *Id*. Deep 6 Marine, LLC provides dive services that include hull inspection and hull cleaning for vessels, dock maintenance and repair, and support for salvage and recovery of stranded or sunken vessels in both states. *Id*. at 25.

Fitzco, a group of related entities based in Shell Knob, Missouri, provides a variety of marine services on the lake, including marine construction, salvage and recovery of stranded and sunken vessels, and yacht and houseboat transport, among others. *Id*. at 18. To deliver these services, Fitzco maintains a fleet of deck barges, crane barges, and other vessels, all of which can and do perform work on Table Rock Lake in both Missouri and Arkansas. *Id*. at 18–21.

There are sixteen commercial marinas on Table Rock Lake—two in Arkansas and fourteen in Missouri—accounting for approximately 133 docks and 4,395 slips for vessels on the lake. *Id*. at 26. While the individual commercial marinas vary in size and type of services offered, together, they provide fuel services, boat and jet ski rentals, charter boat services, houseboat rentals, dock slip rentals, fishing/hunting supplies and licenses, marine parts and accessories, groceries, restaurants, cafes, and convenience stores, in addition to serving as the base of operations for many of the commercial ventures detailed above. *See generally* Curry at 27–55. Customers renting vessels at these marinas operate them across state lines in Missouri and Arkansas, and the marinas accommodate vessels registered across multiple states, with the most common being Arkansas, Missouri, Oklahoma, and Kansas. Curry at 27, 38, 40.

Based on these activities, Table Rock Lake is navigable in fact because it is currently used in interstate commerce. *See, e.g., Moeller v. Mulvey*, 959 F. Supp. 1102, 1107 (D. Minn. 1996) ("the Rainy River is used, by numerous area resorts and fishing guides, for the transport of customers and guests to the Lake of the Woods, which also serves as an international water boundary between the United States and Canada. As well, a sea plane base is located on the River, approximately one mile from the sight of the collision."); *In re Everglades Island Boat Tours, LLC*, 484 F. Supp. 2d 1259, 1262 (M.D. Fla. 2007) (unmarked channel of Everglades held navigable, inter alia, on presence of airboat tours between Florida and the Gulf of Mexico);

*Finneseth*, 712 F.2d at 1042 (noting that "Dale Hollow Lake supports seven to eleven commercial marinas").

      D.      <u>Federal agency determinations of navigability support a finding of navigability for admiralty jurisdiction purposes.</u>

While navigability determinations by federal agencies made pursuant to their regulatory powers "are not controlling in a navigability determination for admiralty jurisdiction, they are not without significance and may be taken into account by a court in determining whether a water body is navigable." *Finneseth*, 712 F.2d at 1045 n.4 (concluding Army Corps of Engineers report provided further evidence of navigability); *see also Hartman*, 522 F. Supp. at 117 ("[T]his Court accords the Corps' determination in the instant case, that Lake Wylie is indeed navigable, the weight it deserves."); *Wilder*, 611 F. Supp. at 846 ("It is also relevant that the Army Corps of Engineers holds the Little River and Catahoula Lake as navigable waters of the United States . . .").

The National Transportation Safety Board ("NTSB") and the United States Coast Guard have determined Table Rock Lake to be navigable. *See* Ex. A (NTSB Preliminary Report at p.2; U.S. Coast Guard letter dated June 14, 1967). The U.S. Army Corps of Engineers has also determined that the lake is a navigable waterway and has exercised jurisdiction under the Rivers and Harbors Act, at least since 1978. *See* Department of the Army Report on Navigability, White River, Table Rock Lake, Missouri and Arkansas, Doc. 156-3, at p. 32 ("[f]ederal permit authority is currently exercised on Table Rock Lake as a "navigable water" pursuant to the Rivers and Harbors Act of 1899 . . ."); *see also* 33 U.S.C. § 403 and 33 C.F.R. § 329.4 (jurisdictional grant over "navigable waters of the United States"). These federal agency determinations should be

given weight in the instant jurisdictional analysis, and support a finding that Table Rock Lake is navigable.[12]

E.    _Edwards v. Hurtel_ is not controlling.

In 1983, the Eighth Circuit upheld the district court's determination that Table Rock Lake was not navigable. _Edwards v. Hurtel_, 717 F.2d 1204, 1205 (8th Cir. 1983), _on reh'g_, 724 F.2d 689 (8th Cir. 1984). Claimants will argue this Court's jurisdictional decision is simple: the Eighth Circuit's opinion in _Edwards_ controls. The correct analysis is not that simple. For procedural and substantive reasons, _Edwards_ is not controlling.

First, _stare decisis_ is inapplicable[13] because navigability is either a question of fact or a mixed question of law and fact. _Stare decisis_ applies only to pure legal questions—not questions of fact or mixed questions of law and fact. See Moore's Federal Prac. § 134.05[3] (citing _Tug Helen B. Moran, Inc. v. Moran Towing and Transp. Co., Inc._, 607 F.2d 1029, 1031 (2d Cir. 1979) and _Wyatt v. Pennsylvania R.R. Co._, 158 F. Supp. 502, 503–04 (D. Del. 1958)). While the legal test for determining navigability is a question of law, most courts hold that whether a body of water is navigable is a question of fact. _See United States v. Appalachian Elec. Power Co._, 311 U.S. 377, 405 (1940) ("The navigability of the New River is, of course, a factual questions but to call it a fact cannot obscure the diverse elements that enter into the application of the legal tests as to navigability"); _State of Arizona v. State of California_, 283 U.S. 423, 452 (1931) (explaining that navigability is a fact capable of judicial notice); _Brevard Cty. v. Blasky_, 875 So.

---

[12] The government asserted in its motion to intervene that "the Criminal Action, including the current charges against McKee and any resulting prosecution of Ripley, is premised on admiralty jurisdiction," Doc. 73 at p. 3, but later argued jurisdiction under 18 USC § 1115 could independently exist under the commerce clause, U.S. Const. art. II, § 8." Doc. 124 at p. 5. While not relevant to the instant motion, Limitation Plaintiffs note that they do not agree with the Government's "independent jurisdiction" argument and reserve all rights on the issue of jurisdiction under 18 USC § 1115.

[13] The principles of collateral estoppel and _res judicata_ are likewise inapplicable because Limitation Plaintiffs did not have a "full and fair opportunity and incentive to litigate the issue in" _Edwards_, nor were Limitation Plaintiffs "parties or privies bound by" _Edwards_. _Lane v. Peterson_, 899 F.2d 737, 741–42 (8th Cir. 1990).

2d 6, 13 (Fla. Dist. Ct. App. 2004) ("Navigability is generally a question of fact."). Some courts, though, treat navigability as a mixed question of law and fact. *See, e.g., Briggs v. Jupiter Hills Lighthouse Marina*, 9 So. 3d 29, 32 (Fla. Dist. Ct. App. 2009) ("the ultimate conclusion as to navigability is a question of law inseparable from the particular facts to which they are applied"). But either way, Limitation Plaintiffs are unaware of any court that has held navigability is solely a question of law. As a result, *Edwards* does not bind the court under *stare decisis*.

Second, even if *stare decisis* applied, *Edwards* does not control because the facts in *Edwards* are not "materially identical" to the facts presented in the current record. *Bendet v. Sandoz Pharm. Corp.*, 308 F.3d 907, 911 (8th Cir. 2002) ("[W]e agree that if the Bendets were to rely on materially identical facts, supported by precisely the same evidence to prove precisely the same causation theory . . . the district court would be bound by our determination in *Glastetter*."). Indeed, a holding "should be limited to the particular facts and issues involved," and "should not be extended beyond that for any purpose of authority in another or different case." *Mut. Benefit Health & Accident Ass'n v. Bowman*, 99 F.2d 856, 858 (8th Cir. 1938). This is because a party has the "right to present the facts which he believes are different from the first case," based on the well-established principle "that every party be guaranteed a day in court[.]" *Topps-Toeller, Inc. v. City of Lansing*, 47 Mich. App. 720, 729 (1973).

Navigability is not a static concept, and as articulated by the Eighth Circuit, the navigability determination for Table Rock Lake is one of *contemporary* navigability in fact. *See Livingston*, 627 F.2d at 170 ("Notwithstanding any expressions to the contrary in prior decisions of this court, federal admiralty jurisdiction turns on contemporary navigability in fact. Because Mrs. Livingston failed to satisfy *this test in the present case* . . .") (emphasis added); *Three Buoys*, 921 F.2d at 779 ("*Present* navigability is the standard . . .") (emphasis in original).

Therefore, a navigability determination made roughly thirty-five years ago in 1983 does not control this Court's determination of whether Table Rock Lake is presently capable of use in interstate commerce. Rather, when determining contemporary navigability in fact, the Court looks to current capability and use, as demonstrated by the factual record before the Court in this case, not the factual record before the Court in *Edwards*.

*Edwards* is not controlling for another reason. The Eighth Circuit itself qualified its ruling and stated that it was making no determination of the propriety of the trial court's findings concerning the "nature of Table Rock Lake." 724 F.2d at 690. It is precisely the "nature of the lake" that is determinative of navigability, and the Eighth Circuit's affirmance in *Edwards* was necessarily based on the record before it. The *Edwards* district court took judicial notice of certain facts related to Table Rock Lake, the propriety of which went unchallenged by the appellant either before the district court or the Eighth Circuit until his petition for rehearing. *See, e.g.*, 724 F.2d at 689–90 ("We noted that in ruling on Hurtel's motion to dismiss, the district court took judicial notice of a number of facts pertinent to our affirmance. Edwards did not raise as an issue on appeal the propriety of the judicial notice taken . . ."). Upon rehearing, the Eighth Circuit denied the appellant's late challenge to those facts as untimely, concluding: "We ratify this panel's prior opinion, and without expressing any view as to the propriety of the district court taking judicial notice of the nature of Table Rock Lake, we affirm the district court's decision." 724 F.2d at 690.

The *Edwards* appellant's failure to timely challenge the court's findings concerning the nature of Table Rock Lake vitiates *Edwards'* precedential value. The district court took judicial notice of the facts that (1) "[Table Rock Lake] has not been susceptible of use for commercial shipping" and (2) "there is no reasonable likelihood that Table Rock Lake will become or be

made navigable in the near future." 717 F.2d at 1205. With the propriety of this judicial notice unchallenged, the Eighth Circuit was bound to affirm the district court's navigability finding. In essence, the ultimate conclusion of the location test was stipulated in the record before the court as an uncontested fact. The Eighth Circuit recognized that the factual stipulation was a stipulation of an ultimate fact when it declined to consider Table Rock Lake's "capability or susceptibility for use as an interstate highway of commerce." Because of that stipulation, the *Edwards* court simply stated "we need not address that issue *under the facts of this case*." 717 F.2d at 1205 (emphasis added). That statement limits the precedential value of *Edwards*.[14] Any court presented with the judicially-noticed fact that a waterway is not susceptible of use for commercial shipping would undoubtedly be precluded from finding navigability based on that fact alone.

Edwards is not controlling. The appellant's failure in *Edwards* to present factual support for navigability does not control the existence of federal admiralty jurisdiction on the waters of Table Rock Lake decades later. Regardless of whether the district court's finding in *Edwards* was based on an accurate factual record thirty-five years ago (it was not), Table Rock Lake is currently used, and capable of use, in interstate commerce—*i.e.*, it is contemporarily navigable in fact under the standard articulated by *Livingston, Finneseth, Price, LeBlanc, Foremost*, or all other Circuit Courts to address the issue. This Court should accordingly find Table Rock Lake is a navigable waterway.

---

[14] Cases that turn on "uncontested assumptions" are "entitled to little weight as a precedent[.]" *Straznicky v. Desert Springs Hosp.*, 642 F. Supp. 2d 1238, 1249 (D. Nev. 2009).

**IV.    The connection test is met: the SD-7 Incident had a potential (and actual) disruptive impact on maritime commerce and a sufficient connection with traditional maritime activity.**

In applying the connection test to the SD-7 Incident, the Court first considers "the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce." *Grubart*, 513 U.S. at 534 (internal quotations and citations omitted). Importantly, "[t]he jurisdictional inquiry does not turn on the actual effects on maritime commerce . . . Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Sisson v. Ruby*, 497 U.S. 358, 363 (1990) (emphasis in original).

The SD-7 Incident falls squarely in the category of events that are likely to disrupt maritime commerce—it involved a maritime vessel in distress in the middle of a storm, with the vessel taking on water and ultimately sinking, resulting in significant search and rescue efforts. Courts consistently find that vessels (or even individual passengers) in distress have a potentially disruptive effect on maritime commerce. *See Marshall v. Wellcraft Marine, Inc.*, 103 F. Supp. 2d 1099, 1107 (S.D. Ind. 1999) ("[T]he hobbled [vessel] represented a potential disruption to maritime commerce in a number of ways. A yacht in distress on the high seas . . . taking on water in the middle of a storm, easily could prompt commercial vessels in the vicinity to lend assistance, thereby diverting such vessels from their charted courses and disrupting their commercial operations."); *Polly v. Estate of Carlson*, 859 F. Supp. 270, 272 (E.D. Mich. 1994) ("That men were overboard in an emergency situation by itself is likely to disrupt commercial activity; this event ordinarily occasions both air and sea searches and rescue operations."); *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 602 (3d Cir. 1991) (finding admiralty jurisdiction over claims by diver who contracted decompression sickness on a scuba excursion, as inter alia, commercial vessels may have been diverted to respond to a potential distress signal); *Great Am.*

*Ins. Co. of New York v. Miller Marine Yacht Servs., Inc.*, No. 5:05CV175 RS/AK, 2006 WL 1776985 (N.D. Fla. June 26, 2006) ("[A] sunken vessel in navigable waters might become a hidden danger to a vessel in maritime commerce, or provide an impediment to the timely movement of commercial vessels into and out of the area.").

More than merely having a *likelihood* of disrupting maritime commerce, the sinking of SD-7 *actually* disrupted maritime commerce. When it sank, SD-7 was engaged in maritime commerce by carrying passengers for hire on a sightseeing tour. *See Sinclair*, 935 F.2d at 602 ("The actual impact [on maritime commerce] arose from the fact that the vessel itself was engaged in a commercial venture."). And SD-7's distress disrupted the commercial activity of the *Branson Belle*, with the vessel and its crew assisting with rescue and recovery efforts for hours, and the vessel providing a base for the subsequent investigation for days. Curry at 23. To facilitate the recovery effort, the Coast Guard established a 250 yard safety zone around the perimeter of the BRANSON BELLE, prohibiting unauthorized vessels from operating in the area. *Id*. In addition, the BRANSON BELLE served as a staging area for personnel and equipment in the recovery of the STRETCH DUCK 7. *Id*. As a result, the BRANSON BELLE suspended operations for several days during the recovery of the STRETCH DUCK 7. *Id*. Thus, the SD-7 Incident had both the potential and an actual impact on maritime commerce and the first prong of the connection test is satisfied.

Under the second prong of the connection test, the Court considers "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (internal quotations and citations omitted). The operation of SD-7 readily meets this condition, as "carrying passengers on a vessel on a navigable waterway is a traditional maritime activity." *Acceptance*, 952 F. Supp. at 646 (citing

*Duluth Superior Excursions, Inc. v. Makela*, 623 F.2d 1251, 1253 (8th Cir. 1980)); *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 979 (8th Cir. 1974) ("[T]he operation of a boat on navigable waters, no matter what its size or activity, is a traditional maritime activity to which the admiralty jurisdiction of the federal courts may extend."); *Reneau v. Shoreline Marine Sightseeing Co.*, No. 84 C 10622, 1986 WL 1589, at *1 (N.D. Ill. Jan. 17, 1986) (finding sightseeing vessel on Lake Michigan was "engaged in a traditional maritime activity"); *Sinclair*, 935 F.2d at 602 ("[T]he transport and care of passengers bears a substantial relationship to traditional maritime activity . . .").

The SD-7 Incident had a potentially disruptive impact on maritime commerce and the operation of SD-7 was a traditional maritime activity, satisfying both prongs of the connection test.

## CONCLUSION

Admiralty jurisdiction exists over claims arising from the SD-7 Incident, as the location test and both prongs of the connection test are met. Under the location test, Table Rock Lake is contemporarily navigable in fact—it has a present capability to sustain, and currently does sustain, interstate commerce. This conclusion is supported by the near-universal judicial determinations that interstate lakes are navigable, the fact that Table Rock Lake is currently being used in interstate commerce, and multiple federal agency determinations that Table Rock Lake is navigable. And the SD-7 Incident satisfies both prongs of the connection test. First, courts consistently find that vessels in distress have the potential to disrupt maritime commerce, and here the Incident actually disrupted maritime commerce: its own commercial operations and those of the vessels engaged in rescue efforts. Second, carrying passengers for hire is a traditional maritime activity.

26

For the foregoing reasons, this Court should find it has admiralty jurisdiction pursuant to Article III, § 2 of the United States Constitution and 28 U.S.C. § 1333(1).

Dated: July 8, 2019                    Respectfully submitted,

**LASHLY & BAER, P.C.**

*/s/ Terrance J. Good*
Terrance J. Good #25336MO
Alexandra C. Wells #67316MO
714 Locust Street
St. Louis, MO 63101
(314) 621-2939
(314) 621-6844/Fax
tjgood@lashlybaer.com
awells@lashlybaer.com

AND

**K&L GATES LLP**
Jeffrey S. King, *Pro Hac Vice*
Luke M. Reid, *Pro Hac Vice*
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
(617) 261-3100
(617) 261-3175/Fax
jeffrey.king@klgates.com
luke.reid@klgates.com

*Attorneys for Limitation Plaintiffs Branson Duck*
*Vehicles, LLC and Ripley Entertainment, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was filed and served via the Court's electronic filing system this 8th day of July 2019.

*/s/ Terrance J. Good*
Terrance J. Good #25336MO