UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| *IN THE MATTER OF THE* )<br>*COMPLAINT OF BRANSON DUCK* )<br>*VEHICLES, LLC, AS OWNER AND* )<br>*RIPLEY ENTERTAINMENT INC. AS* )<br>*OWNER PRO HAC VICE OF THE* )<br>*STRETCH DUCK 07 FOR* )<br>*EXONERATION FROM OR* )<br>*LIMITATION OF LIABILITY.* ) | No. 3:18-cv-03339-MDH |

**RIDE THE DUCKS INTERNATIONAL, LLC'S**
**NAVIGABILITY AND STANDING BRIEF**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... ii-iv

Introduction .............................................................................................................. 1-4

Citations and Argument ............................................................................................ 4-23

I.     Ride the Ducks International's Limitation Action is Appropriate

Because the July 19, 2018, Incident Occurred on a Navigable

Waterway ........................................................................................................ 4-18

     A.     Admiralty Jurisdiction ....................................................................... 4

          1.     The "Locality" Requirement .................................................. 4-6

          2.     The "Nexus" Requirement ...................................................... 6-8

     B.     Table Rock Lake Is a Navigable Waterway Capable of Supporting

Interstate Commerce and in Fact *Does Support* Interstate Commerce

in Its Present Capacity ........................................................................ 8-17

     C.     The July 19, 2018, Incident Disrupted Maritime Commerce and Was

Substantially Related to Maritime Activity ..................................... 17-18

II.     Ride the Ducks International Has Standing to Bring a Limitation

Action Because of the Considerable Investment It Made in

Stretch Duck 7 ............................................................................................... 18-22

Conclusion .............................................................................................................. 22-23

Certificate of Service ................................................................................................. 23

i

# TABLE OF AUTHORITIES

**Cases**

*Acceptance Ins. Co. v. SDC, Inc.*, 952 F. Supp. 644 (E.D.Mo. 1997) ...........................................7

*Alford v. Appalachian Power Co.*, 951 F.2d 30 (4th Cir. 1991) ...................................................5

*Calkins v. Graham*, 667 F.2d 1292 (9th Cir. 1982)................................................................21, 22

*Charnis v. Watersport Pro, LLC*, 2009 WL 2581699 (D. Nev. May 1, 2009).......................5, 16

*Cobb v. Aramark Sports & Ent. Servs., LLC*, 933 F. Supp. 2d 1295 (D. Nev. 2013) ...........5, 16

*Complaint of Am. Export Lines, Inc.*, 73 F.R.D. 454 (S.D.N.Y. 1977) ......................................13

*Complaint of Armatur, S.A.*, 710 F. Supp. 390 (D. Puerto Rico 1988) .....................................13

*Complaint of Chesapeake Shipping, Inc.*, 803 F. Supp. 872 (S.D.N.Y 1992)...........................19

*Complaint of Nobles*, 842 F. Supp. 1430 (N.D. Fla. 1993) ........................................................19

*Complaint of Three Buoys Houseboat*

    *Vacations U.S.A., Ltd.*, 921 F.2d 775 (8th Cir. 1990) ...............................................4, 5, 7, 16

*Duke v. United States*, 711 F. Supp. 332 (E.D. Tex. 1989) .........................................................4, 5

*Edwards v. Hurtel*, 717 F.2d 1204 (8th Cir. 1983),

    *aff'd on reh'g*, 724 F.2d 689 (8th Cir. 1984) ...................................................................16, 17

*Finneseth v. Carter*, 712 F.2d 1041 (6th Cir. 1983)...................................................................16

*Flecker v. Statue Cruises*, 129 A.3d 1129 (N.J. Super. Ct. Law Div. 2013) ...........................16

*Flink v. Paladini*, 279 U.S. 59 (1929)........................................................................................19

*Great Am. Ins. Co. of New York v. Miller Marine Yacht Servs., Inc.*,

    2006 WL 1776985 (N.D. Fla. June 26, 2006)) ....................................................................7, 8

*Hartman v. United States*, 522 F. Supp. 114 (D.S.C. 1981).........................................................6

ii

11728761.1

*In re Am. Milling Co.*, 270 F. Supp. 2d 1068 (E.D.Mo. 2003)

    *aff'd in part, rev'd in part*, 409 F.3d 1005 (8th Cir. 2005) ................................18, 19

*In re Marine Recreational Opportunities, Inc.*, 15 F.3d 270 (2d Cir. 1994)................18, 19, 21

*In re The Trojan*, 167 F. Supp. 576 (N.D. Cal. 1958)................................18, 19, 20, 22

*In re Zebroid Trawling Corp.*, 428 F.2d 226 (1st Cir. 1970) ................................19, 20

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1994)................6, 7

*Lewis & Clark Marine, Inc. v. Lewis*, 258 F.3d 888 (8th Cir. 2001)................................4

*Marshall v. Wellcraft Marine, Inc.*, 103 F. Supp. 2d 1099 (S.D. Ind. 1999) ................8

*Mullenix v. United States*, 984 F.2d 101 (4th Cir. 1993) ................................16

*Polly v. Estate of Carlson*, 859 F. Supp. 270 (E.D. Mich. 1994) ................................8

*Reneau v. Shoreline Marine Sightseeing Co.*, 1986 WL 1589 (N.D.Ill. Jan. 17, 1986)..............7

*Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929 (E.D. La. 2010) ............................5, 16

*St. Hilaire Moye v. Henderson*, 496 F.2d 973 (8th Cir. 1974)................................7

*Sinclair v. Soniform, Inc.*, 935 F.2d 599 (3d Cir. 1991) ................................7

*Sisson v. Ruby*, 497 U.S. 358 (1990)................................6, 7

*Tundidor v. Miami-Dade County*, 108 F. Supp. 3d 1312 (S.D. Fla. 2015) ................................5

*United States v. White's Ferry Inc.*, 382 F. Supp. 162 (D. Md. 1974) ................................5, 16


**Statutes**

28 U.S.C. §§ 1333................................................................................4

46 U.S.C. §§ 30501-30512 ................................................................4, 18, 22

46 U.S.C. § 30501................................................................................19

11728761.1

**Regulations**

33 C.F.R. § 2.36 ...................................................................................................................5

33 C.F.R. § 329.3 ...............................................................................................................4

33 C.F.R. § 329.4 ...............................................................................................................5

33 C.F.R. § 329.6 ......................................................................................................5, 6, 15

33 C.F.R. § 329.14 .....................................................................................................6, 14

11728761.1

Ride the Ducks International, LLC, by and through its attorneys Sandberg Phoenix & von Gontard P.C., submits the following brief on navigability and standing issues pursuant to the Court's April 2, 2019, Case Management Schedule and Order (Doc. 135):

## **INTRODUCTION**

This case involves the July 19, 2018, sinking of Stretch Duck 7 that occurred near river mile 1.0 on the Long Creek tributary to Table Rock Lake in Stone County, Missouri.[1] Stretch Duck 7 is an updated DUKW boat that General Motors Corporation originally built in 1944 for use during World War II transporting ammunition, supplies, and equipment from ships in offshore transport areas to supply dumps and fighting units on beaches. The DUKW boat was modified into its current Stretch Duck configuration in March 1998 by Ozarks Scenic Tours, Inc., a corporation that later changed its name to OST Investments, Inc., on November 16, 2001. (March 15, 2001, Certificate of Inspection, Exhibit 1; Amendment of Articles of Incorporation of Ozarks Scenic Tours, Inc., Exhibit 2.)

Ozarks Scenic Tours, LLC, which was created on November 19, 2001, then owned and operated the boat until August 8, 2005, when Ozarks Scenic Tours, LLC, and a number of limited liability companies were merged into Ride the Ducks International, LLC ("RTDI"). (December 3, 2001, Bill of Sale and Assignment, Exhibit 3; Notices and Articles of Merger of Limited Liability Companies, Exhibit 4.) OST Investments was merged into RTDI less than a year later on April 11, 2006. (Articles of Merger of OST Investments, Inc. Into Ride the Ducks International, LLC, Exhibit 5.) RTDI thereafter owned Stretch Duck 7 and operated the vessel as part of the Branson Duck Boat Tours it conducted until Stretch Duck 7 was sold to Ripley

---

[1] Wikipedia indicates the accident scene's coordinates are 36°35′16″N 93°19′06″W.

Entertainment Inc. pursuant to a December 1, 2017, Asset Purchase Agreement. Branson Duck Vehicles, LLC, owned Stretch Duck 7 when the boat sank on July 19, 2018. (Doc. 1, ¶ 2.)

Throughout the time they owned and operated Stretch Duck 7, RTDI and its merged predecessors invested significant time and money into Stretch Duck 7 to improve the vessel's safety and to upgrade its design. These improvements included adding a watertight drive penetration compartment known as a "sea chest" to mitigate the chance of flooding the hull. (Ride the Ducks International Stretch Duck Technical Overview, Exhibit 6[2]; Herschend Family Entertainment Job Master Documents, Exhibit 7.) Other upgrades incorporated into Stretch Duck 7 to mitigate the chance of the hull flooding included adding a secondary seal on the watertight boot connecting the driveshaft to the vessel's housing, reducing the plug size on the drive tubes, and reducing the size of the hull plugs. (New Duck Technology, Exhibit 8; RTDI Duck Development, Exhibit 9.) Additionally, the size of the openings on the sides of the boat's canopy was increased and emergency drop away curtains were installed to allow for rapid escape during a flooding event. (New Duck Technology, Exhibit 8; RTDI Duck Development, Exhibit 9.) Further, the front windshield was modified so it could be pushed open and away from the canopy to create another emergency exit. (New Duck Technology, Exhibit 8; RTDI Duck Development, Exhibit 9.) Stretch Duck 7's canopy was also changed to a canvas-type material that in a sinking event allows the canopy to tear away from the DUKW boat frame from water pressure that is created during the event. (New Duck Technology, Exhibit 8; RTDI Duck Development, Exhibit 9.) RTDI's investment in Stretch Duck 7 between 2010 and the December 1, 2017, sale to Ripley Entertainment for these upgrades and for other repairs and maintenance

---

[2]     Ride the Ducks International has filed a motion to submit Exhibit 6 under seal.

11728761.1

was more than $130,000.  (Herschend Family Entertainment Job Master Documents, Exhibit 7; Job Status Inquiries, Exhibit 10; AssetWorks Documents, Exhibit 11.[3])

RTDI filed its Complaint (United States District Court for the Western District of Missouri No. 6:19-cv-05006-MDH, Doc. 2) seeking exoneration from or limitation of liability associated with the personal injuries, deaths, and other damages the passengers and crew on Stretch Duck 7 experienced as well as the personal injuries and other damages those responding to the incident have or may assert.  Contrary to several claimants' arguments, this Court is entitled to exercise admiralty jurisdiction over RTDI's, Branson Duck Vehicles', and Ripley Entertainment's limitation actions because Table Rock Lake (including the Long Creek tributary where the July 19, 2018, incident occurred) (1) is a navigable waterway in that it borders two states and (2) is capable of supporting and in fact ***does support*** commercial maritime activity in its present capacity according to the overwhelming evidence and testimony adduced during discovery.[4]  To be sure, numerous federal agencies over the past 50-plus years and through the present day have concluded Table Rock Lake and the Long Creek tributary are navigable waterways.  RTDI also has standing to bring this limitation action as Stretch Duck 7's prior owner based on the significant monetary investment RTDI and its merged predecessors made to upgrade and improve Stretch Duck 7 while RTDI and those merged predecessors owned the vessel and due to the fact the claimants' liability allegations against RTDI are based on RTDI's and its merged predecessors' conduct while they owned Stretch Duck 7.  For these reasons,

---

[3]        Ride the Ducks International has filed a motion to submit Exhibit 11 under seal.

[4]        Several claimants have admitted Table Rock Lake is a navigable waterway.  (Doc. 52, ¶ 10; United States District Court for the Western District of Missouri No. 6:19-cv-05006-MDH, Doc. 18, ¶¶ 4-5.)

11728761.1

RTDI along with Branson Duck Vehicles and Ripley Entertainment should be allowed to proceed with their limitation actions.

## CITATIONS AND ARGUMENT

## I. RIDE THE DUCKS INTERNATIONAL'S LIMITATION ACTION IS APPROPRIATE BECAUSE THE JULY 19, 2018, INCIDENT OCCURRED ON A NAVIGABLE WATERWAY.

### A. Admiralty Jurisdiction

Federal district courts have exclusive jurisdiction over suits brought pursuant to the Limitation of Liability Act. 28 U.S.C. § 1333(1); 46 U.S.C. §§ 30501-30512; *Lewis & Clark Marine, Inc. v. Lewis*, 258 F.3d 888, 890 (8th Cir. 2001). An action falls within a federal district court's admiralty jurisdiction when (1) the underlying tort occurs on a navigable waterway (the "locality" requirement) and (2) the action giving rise to the claim bears a sufficient relationship to maritime activities (the "nexus" requirement). *Complaint of Three Buoys Houseboat Vacations U.S.A. Ltd.*, 921 F.2d 775, 777 (8th Cir. 1990).

### 1. The "Locality" Requirement

The term "navigability" is "subject to different definitions depending upon the context of the case." *Three Buoys*, 921 F.2d at 778. Navigability for admiralty jurisdiction purposes has been compared to navigability for United States Army Corps of Engineers jurisdiction "because both standards rely upon a functional analysis of navigability." *Duke v. United States*, 711 F. Supp. 332, 333 (E.D. Tex. 1989) (discussing the Suits in Admiralty Act's jurisdictional test that is identical to the jurisdictional test for Limitation of Liability Act claims). Indeed, the policies and criteria the Corps of Engineers has established to determine navigability "are in close conformance with the tests used by Federal courts." 33 C.F.R. § 329.3. "Additionally, Coast

11728761.1

Guard jurisdiction has closely followed Corps of Engineers jurisdiction because of similar functional bases." *Duke*, 711 F. Supp. at 333.

In federal courts, the navigability test for admiralty jurisdiction is whether a body of water is ***susceptible or capable*** of supporting interstate commerce in its present capacity. *Three Buoys*, 921 F.2d at 778-79 (citing *Livingston v. United States*, 627 F.2d 165, 169-70 (8th Cir. 1980), *cert. denied*, 450 U.S. 914 (1981)). *See also Alford v. Appalachian Power Co.*, 951 F.2d 30, 32 (4th Cir. 1991); *Tundidor v. Miami-Dade County*, 108 F. Supp. 3d 1312, 1317-18 (S.D. Fla. 2015); *Cobb v. Aramark Sports & Ent. Servs., LLC*, 933 F. Supp. 2d 1295, 1298 (D. Nev. 2013); *Rogers v. Coastal Towing, L.L.C.*, 723 F. Supp. 2d 929, 932 n.3 (E.D. La. 2010); *Charnis v. Watersport Pro, LLC*, 2009 WL 2581699, at *2 (D. Nev. May 1, 2009); *United States v. White's Ferry Inc.*, 382 F. Supp. 162, 165 (D. Md. 1974). The Corps of Engineers employs a nearly identical test for navigability and has determined "[n]avigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or ***may be susceptible for use*** to transport interstate or foreign commerce." 33 C.F.R. § 329.4 (emphasis added). Similarly, the Coast Guard's "navigable waters" definition includes "[i]nternal waters of the United States not subject to tidal influence that . . . [a]re or have been used, or ***are or have been susceptible for use***, by themselves or in connection with other waters, as highways for substantial interstate or foreign commerce, notwithstanding natural or man-made obstructions that require portage." 33 C.F.R. § 2.36(a)(3) (emphasis added).

When evaluating whether the types of commercial use on a waterway are sufficient to establish navigability, the Corps of Engineers is not concerned with "the time, extent or manner of that use." 33 C.F.R. § 329.6(a). Instead, "the waterbody's ***capability*** of use by the public for purposes of transportation of commerce . . . is the determinative factor." § 329.6(a) (emphasis

11728761.1

added).  Consequently, establishing a waterway's "potential for commercial use at any past, present, or future time" is sufficient to demonstrate navigability and

> may be shown by historical use of canoes, bateaux, or other frontier craft, as long as that type of boat was common or well-suited to the place and period. Similarly, the particular items of commerce may vary widely, depending again on the region and period.  The goods involved might be grain, furs, or other commerce of the time.

§ 329.6(a).  "[T]he presence of **recreational craft** may [also] indicate that a waterbody is capable of bearing some forms of commerce, either presently, in the future, or at a past point in time."  § 329.6(a) (emphasis added).  Federal agency navigability determinations are "accorded substantial weight by the courts" even though "conclusive determinations of navigability can only be made by federal Courts."  33 C.F.R. § 329.14(a).  *See also Hartman v. United States*, 522 F. Supp. 114, 117 (D.S.C. 1981) (navigability determination "is certainly an appropriate exercise of the regulatory authority of the Corps of Engineers under the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403, 404, 407 and 408").

## 2. The "Nexus" Requirement

A court addressing the "nexus" requirement for admiralty jurisdiction must first consider "'the general features of the type of incident involved' . . . to determine whether the incident has 'a potentially disruptive impact on maritime commerce.'"  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1994) (quoting *Sisson v. Ruby*, 497 U.S. 358, 363-64 (1990)).  Importantly, "[t]he jurisdictional inquiry does not turn on the *actual* effects on maritime commerce. . . .  Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity."  *Sisson v. Ruby*, 497 U.S. 358, 363 (1990).

The "nexus" requirement's second prong involves considering "whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Jerome B. Grubart, Inc.*, 513 U.S. at 534 (quoting *Sisson*, 497 U.S. at 364-65 and n.2). Importantly, "carrying passengers on a vessel on a navigable waterway is a traditional maritime activity." *Acceptance Ins. Co. v. SDC, Inc.*, 952 F. Supp. 644, 646 (E.D.Mo. 1997). *See also Sinclair v. Soniform, Inc.*, 935 F.2d 599, 602 (3d Cir. 1991); *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 979 (8th Cir. 1974) ("the operation of a boat on navigable waters, no matter what its size or activity, is a traditional maritime activity to which the admiralty jurisdiction of the federal courts may extend"); *Reneau v. Shoreline Marine Sightseeing Co.*, 1986 WL 1589, at *1 (N.D.Ill. Jan. 17, 1986) (sightseeing vessel on Lake Michigan was "engaged in traditional maritime activity").

According to the Eighth Circuit Court of Appeals, "the nexus requirement has become rather easily satisfied, and rightfully so." *Three Buoys*, 921 F.2d at 777. As a result, "the navigability question . . . seems more controlling and perhaps the one true determinant of admiralty jurisdiction." *Id. See also Sisson*, 497 U.S. at 374 (Scalia, J.) ("A vessel engages in traditional maritime activity for [admiralty jurisdiction] purposes when it navigates, . . . when it lies in dock, . . . and when it does ***anything else*** (*e.g.*, dropping anchor) that vessels normally do in navigable waters" (emphasis added).). Regardless, courts consistently find vessels or even individual passengers in distress have a potentially disruptive effect on maritime commerce, which supports a district court's admiralty jurisdiction over a claim arising out of such an incident. *See Sinclair*, 935 F.2d at 602 (3d Cir. 1991) (finding admiralty jurisdiction over claims by diver who contracted decompression sickness on a scuba excursion because commercial vessels may have been diverted to respond to a potential distress signal); *Great Am. Ins. Co. of*

*New York v. Miller Marine Yacht Servs., Inc.*, 2006 WL 1776985, at *4 (N.D. Fla. June 26, 2006) ("[A] sunken vessel in navigable waters might become a hidden danger to a vessel in maritime commerce, or provide an impediment to the timely movement of commercial vessels into and out of the area."); *Marshall v. Wellcraft Marine, Inc.*, 103 F. Supp. 2d 1099, 1107 (S.D. Ind. 1999) ("[T]he hobbled [vessel] represented a potential disruption to maritime commerce in a number of ways. A yacht in distress on the high seas . . . taking on water in the middle of a storm, easily could prompt commercial vessels in the vicinity to lend assistance, thereby diverting such vessels from their charted courses and disrupting their commercial operations."); *Polly v. Estate of Carlson*, 859 F. Supp. 270, 272 (E.D. Mich. 1994) ("That men were overboard in an emergency situation by itself is likely to disrupt commercial activity; this event ordinarily occasions both air and sea searches and rescue operations.").

> **B.    Table Rock Lake Is a Navigable Waterway Capable of Supporting Interstate Commerce and in Fact *Does Support* Interstate Commerce in Its Present Capacity.**

Waterways management expert Marc Patrick Curry's and commercial and recreational vessel Captain Joseph E. Killian's analyses regarding Table Rock Lake's physical characteristics and the activities for which the Lake is currently used demonstrate Table Rock Lake is a navigable waterway. (Curry Affidavit, Doc. 154; Killian Affidavit, Doc. 155.) Curry identified considerable commercial activity on Table Rock Lake, to include 16 commercial marinas, 133 commercial docks, 4,395 commercial vessel slips, 1,894 private docks, and 13,388 private vessel slips. (Doc. 154, at 9.) Additionally, he noted 43 public use areas around the Lake and 12 campgrounds the Corps of Engineers currently manages. (Doc. 154, at 9.) Further, in 2016, seven million visitors to Table Rock Lake (including four million boaters) were responsible for spending $321 million, creating 2,643 jobs and $71 million in worker earnings, and generating $55 million in National Economic Benefits. (Doc. 154, at 9-10.)

11728761.1

Curry also documented a number of specific commercial endeavors on Table Rock Lake such as the *Lady Liberty* dinner cruise vessel that can carry as many as 45 passengers at a time between Missouri and Arkansas and that also navigates to the Long Creek Marina. (Doc. 154, at 10-12.) Another commercial vessel is the *Branson Belle*, which provides a showboat experience, dining, and entertainment for up to 700 passengers at a time. (Doc. 154, at 12-13.) The Coast Guard-inspected *Spirit of America*, which docks at State Park Marina, also offers daily cruises on Table Rock Lake and can accommodate up to 49 passengers for hire. (Doc. 154, at 14, 48.)

Approximately 16 commercial marinas that account for 133 docks and 4,395 vessel slips are also available for Table Rock Lake boaters in Missouri and Arkansas. (Doc. 154, at 26.) Vessels docked at these marinas are registered in Arkansas, Missouri, Oklahoma, Kansas, and other states. (Doc. 154, at 27.) The Table Rock Lake marinas located in Arkansas include the Holiday Island Marina and the Cricket Creek Marina, both of which are located in Arkansas and serve visitors with boats registered in Missouri, Arkansas, and other states. (Doc. 154, at 27-36.) The Holiday Island Marina, which is part of the Holiday Island planned community, offers customers fuel for their boats, boat and jet ski rental, slip rental, a café, a convenience store, fishing tackle, and bait. (Doc. 154, at 28.) Holiday Island Marina also makes slips available for rental seasonally or on a daily basis for about 180 vessels at five docks. (Doc. 154, at 28.) Significantly, customers renting boats and jet skis at the Holiday Island Marina customarily operate those vessels in Missouri and Arkansas. (Doc. 154, at 28.)

As far as the Cricket Creek Marina is concerned, the facility is located near the Ozarks RV Resort and the Cricket Creek Park/Campground, the latter of which is a Corps of Engineers campground with 37 camp sites, hot showers, drinkable water, a swim area, a playground, a boat ramp, and a picnic area. (Doc. 154, at 31.) Like the Holiday Island Marina, the Cricket Creek

Marina offers customers fuel, boat rental, dock slip rental, fishing and hunting licenses, groceries, water skiing accessories, fishing bait and tackle, and marine parts and accessories. (Doc. 154, at 31.) Customers renting boats from the Cricket Creek Marina routinely operate those boats in various locations on Table Rock Lake throughout Missouri and Arkansas. (Doc. 154, at 31.)

The 16 commercial marinas on Table Rock Lake's Missouri side provide goods and services similar to those the Arkansas marinas offer and accommodate customers on boats that freely navigate between Missouri and Arkansas. (Doc. 154, at 36-55.) One of these marinas, the Port of Kimberling Marina and Resort located at Kimberling City on the Schooner Creek branch of the Lake, is the largest marina on Table Rock Lake and is home to Captain Nat's charter boat service, to Five Star Houseboat Vacations, to Coyote's Dockside Café, and to a new and used boat dealer named Table Rock Boats. (Doc. 154, at 43-44.) Five Star Houseboat Vacations maintains nine houseboats that are approximately 60 to 80 feet in length with space for 10 to 16 guests. (Doc. 154, at 43.) Another Missouri marina known as State Park Marina is home to a para-sailing operation called American Para-Sail. (Doc. 154, at 48.)

Multiple other businesses on Table Rock Lake offer a number of commercial goods and services to customers and visitors throughout Missouri and Arkansas. For example, Sea Tow uses six vessels on Table Rock Lake to provide commercial marine assistance to members on both sides of the Missouri-Arkansas border. (Doc. 154, at 14-16.) Additionally, TowBoatUS and MariTow U.S., LLC, operate emergency and nonemergency towing, vessel recovery, environmental cleanup, catastrophe response, and salvage services on Table Rock Lake and at times cross the Missouri-Arkansas state line by water. (Mike Fitzpatrick Affidavits, Exhibits 12 and 13.) Boat/U.S., Inc., also delivers various marine assistance services such as towing, soft

11728761.1

ungroundings, battery jumps, fuel delivery, dock repair, salvage assistance for stranded or sunken vessels, and oil spill cleanup. (Doc. 154, at 16-17.) Further, an outfit called Fitzco operates deck and crane barges on Table Rock Lake in connection with dock and other marine construction activities and to salvage and recover vessels. (Doc. 154, at 18-23.) In fact, Fitzco's crane barge, personnel, and other equipment were used to retrieve Stretch Duck 7. (Doc. 154, at 22-23.)

Fitzco is not the only dock construction and repair company that operates throughout Table Rock Lake. (Doc. 154, at 25-26.) At least six other such companies do business on the Lake, which includes entities such as MariCorp U.S., LLC, D&R Dock Builders, Wilson Dock Construction, Colliers Boat Dock Co., Dave's Dock Service, and Dry Docker Boat Lifts and Docks. (Doc. 154, at 25-26.) MariCorp U.S. and other larger dock construction and repair companies routinely fabricate parts at their own facilities, ship those parts to one of three sites on Table Rock Lake's Missouri side that the Corps of Engineers own, and then use barges and other vessels to transport those parts to on-site installation locations in Missouri and Arkansas. (Doc. 154, at 26.) MariCorp U.S. representative Kyle Wilkerson confirmed the company crosses the Missouri-Arkansas border on Table Rock Lake to provide its services. (Kyle Wilkerson Affidavit, Exhibit 14.) Top Shelf Boat and Lift, LLC, Boat Docks and More, LLC, and AirHoist, LLC, representatives also verified their businesses deliver goods and services across state lines on Table Rock Lake. (Stacie Fultz Affidavit, Exhibit 15; Randy Boss Affidavit, Exhibit 16; Mike Fitzpatrick Affidavit, Exhibit 17.)

Other commercial businesses operating on Table Rock Lake include dive excursion companies like DiVentures Springfield, LLC, the White River Dive Company, and Deep 6 Marina, LLC, each of which is capable of transporting divers anywhere on Table Rock Lake in

both Missouri and Arkansas. (Doc. 154, at 23-25.) The Lake also welcomed over a million people for fishing visits in 2016 and at least six companies provide fishing guide services on the waterway throughout Missouri and Arkansas. (Doc. 154, at 56.) Don House from Branson Fishing Guide Service has indicated his outfit operates in Missouri and Arkansas and that it charges and receives payment from customers from Missouri, Arkansas, Oklahoma, Kansas, Tennessee, Illinois, and other states. (Don House Affidavit, Exhibit 18.)

The countless commercial endeavors that take place *today* on Table Rock Lake between Missouri and Arkansas demonstrate the waterway is not only *susceptible or capable* of supporting interstate commerce in its present capacity, it actually supports *current* interstate commerce. Even many of the limitation claimants' own witnesses concede Table Rock Lake in its current physical configuration is capable or susceptible of allowing the movement of goods by vessel between Missouri and Arkansas. (Donelan Deposition, Exhibit 19, at 27:12-25, 44:16-46:15; Cameron Deposition, Exhibit 20, at 79:21-80:04, 86:06-12, 96:03-97:20; Hathaway Deposition, Exhibit 21, at 42:16-44:01) Specific examples of goods the limitation claimants' witnesses agreed can be transported by barge on Table Rock Lake between Missouri and Arkansas for sale include dock construction materials and timber. (Donelan Deposition, Exhibit 19, at 28:01-29:03; Hathaway Deposition, Exhibit 21, at 29:10-30:17.) Consequently, Table Rock Lake and the area on Long Creek where the July 19, 2018, accident occurred must be considered a navigable waterway for admiralty jurisdiction purposes.

This conclusion is reinforced by the jurisdictional bases the National Transportation Safety Board (NTSB), the United States Attorney, and others have asserted to support their authority to investigate the July 19, 2018, accident and the Coast Guard's jurisdictional claim over DUKW boats operating on Table Rock Lake. For example, the NTSB and the United States

Attorney have both unequivocally determined the accident occurred on a navigable waterway. (National Transportation Safety Board Preliminary Report Marine DCA18MM028, United States District Court for the Western District of Missouri No. 6:19-cv-05006-MDH, Doc. 2-1; *United States of America v. Kenneth Scott McKee, et al.*, United States District Court for the Western District of Missouri No. 3:18-cr-05043-01/03-CR-SW-MDH, Doc. 21, ¶¶ 47, 48, 51, 53, 56, 58, and 60.) *See Complaint of Armatur, S.A.*, 710 F. Supp. 390, 402 (D. Puerto Rico 1988) (factual findings from Coast Guard and NTSB reports are admissible); *Complaint of Am. Export Lines, Inc.*, 73 F.R.D. 454, 458-59 (S.D.N.Y. 1977) (same). The United States Attorney's June 13, 2019, Superseding Indictment (*United States of America v. Kenneth Scott McKee, et al.*, United States District Court for the Western District of Missouri No. 3:18-cr-05043-01/03-CR-SW-MDH, Doc. 21) continues invoking admiralty jurisdiction as its authority for prosecuting the defendants in that matter even ***after*** agreeing the commerce clause provides an alternative jurisdictional basis for prosecution. (Doc. 124, at 3.)

Limitation claimants' witness John Cameron acknowledged the fact the NTSB is investigating the accident indicates the NTSB has concluded the accident occurred on a navigable waterway. (Cameron Deposition, Exhibit 20, at 48:24-49:03.) Further, Cameron agreed the Coast Guard would be exceeding its jurisdiction if it were inspecting DUKW boats on Table Rock Lake and the accident at issue if the Lake had not been determined to be a navigable waterway. (Cameron Deposition, Exhibit 20, at 39:15-40:08.) Put another way, Cameron's testimony confirms the Coast Guard has concluded Table Rock Lake is navigable by virtue of the fact they have assumed responsibility for inspecting and certifying DUKW boats that operate on the waterway.

11728761.1

A 1967 memorandum that William C. Behan of the United States Coast Guard authored and that notes Coast Guard records indicate Table Rock Lake is navigable because it is an interstate lake lends further support to the conclusion Table Rock Lake is a navigable waterway. (Behan Memorandum, Exhibit 22.)  Similarly, a 1978 United States Army Corps of Engineers Report recommended that Table Rock Lake and the Long Creek tributary that includes the area where the July 19, 2018, incident occurred both "be declared navigable."  (Report on Navigability – White River – Table Rock Lake – Missouri and Arkansas – June 1978,[5] Doc. 156-3., at 19-20.[6])  *See* § 329.14(a) (federal agency navigability determinations are "accorded substantial weight by the courts").  Significantly, limitation claimants' witnesses John Cameron and Claude Harris confirmed they are unaware of any subsequent Coast Guard or Corps of Engineers determination overturning the 1967 memorandum's or the 1978 Report's findings. (Cameron Deposition, Exhibit 20, at 45:03-14, 57:05-16; Harris Deposition, Exhibit 23, at 95:06-08.)

As part of its 1978 Report, the Corps of Engineers examined the historical record regarding commerce on Table Rock Lake and noted "only the Indians, explorers and fur traders had visited the upper White River Valley" before 1800.  (Doc. 156-3, at 15.)  In the early nineteenth century, however, river merchants began transporting flour, salt, whiskey, gunpowder, coffee, and hardware to settlers in the region in exchange for bear bacon, buffalo beef, beeswax, honey, furs, and pelts.  (Doc. 156-3, at 15.)  "Later grain, cotton and livestock were floated down the river to distant markets . . . [and b]y the mid-1840's, steamboats were unloading cargoes at

---

[5]     The Corps of Engineers' Report follows the form § 329.14(c) prescribes.

[6]     Page number references reflect the original page numbers in the Report rather than the ECF page numbers.

11728761.1

Dubuque, Arkansas, 2 miles below." (Doc. 156-3, at 15-16.) Steamers continued to haul cargo to Forsyth, Missouri, until the Civil War after "a new channel was cut [in 1851] at Elbow Shoal near the State line." (Doc. 156-3, at 16.)

"Steamboat commerce to Forsyth, and occasionally to the James River, was again revived after the Civil War, [albeit] with less success and enthusiasm." (Doc. 156-3, at 16.) Regardless, "[d]own-river flatboat commerce continued throughout the steamboat era and into the 1900's, [and l]ocal newspapers often reported down-river shipments of cotton bales, grain, cross ties and cedar logs." (Doc. 156-3, at 16.) Two steamers also hauled freight and passengers between Forsyth and Branson from 1906 until Ozark Beach Dam construction began in 1911. (Doc. 156-3, at 16.) In other words, the Corps of Engineers' Report revealed the rivers that form Table Rock Lake had an extensive history of commercial activity for more than a century, a history limitation claimants' witness Michael Donelan acknowledged when he testified there was some form of interstate marine trade occurring on that portion of the White River that is now Table Rock Lake before the Table Rock Dam was installed. (Donelan Deposition, Exhibit 19, at 24:16-21.) *See* § 329.6(a) (transporting items by boats suitable to the place and period can establish "sufficient commerce" for navigability purposes). Subsequent projects on the White River, to include construction of Table Rock Dam and Beaver Dam, actually ***improved*** the River's "navigational characteristics" that had historically permitted interstate marine trade. (Doc. 156-3, at 13.)

Ultimately, the Corps of Engineers recommended Table Rock Lake and its various tributaries "be declared navigable" based on the waterway's significant commercial shipping history and its potential to support interstate commerce in the future. (Doc. 156-3, at 19-20.) The Table Rock Lake tributaries that the Corps of Engineers concluded were navigable included

11728761.1

the section on Long Creek between the Creek's mouth and river mile 31.2 within which the July 19, 2018, incident occurred. (Doc. 156-3, at 20.) Additionally, the Corps of Engineers noted Table Rock Lake is "capable of navigation for its full length to Beaver Dam [in Arkansas]." (Doc. 156-3, at 19.) The Corps of Engineers' recommendation is consistent with decisions from numerous United States courts that have uniformly held a lake that borders two states is **susceptible or capable** of supporting interstate commerce, even in circumstances where the lake currently supports recreational boats only. *See Three Buoys*, 921 F.2d at 779 (distinguishing between the Lake of the Ozarks as a non-navigable lake that can only maintain **intrastate** shipping with navigable bodies of water that can maintain **interstate** shipping). *See also Mullenix v. United States*, 984 F.2d 101, 103-04 n.3 (4th Cir. 1993); *Finneseth v. Carter*, 712 F.2d 1041, 1044, 1046-47 (6th Cir. 1983) (lake straddling Kentucky and Tennessee is navigable as an interstate highway for commerce even where the only maritime traffic operating on the lake at the time the opinion was entered were pleasure craft); *Cobb*, 933 F. Supp. 2d at 1298 (body of water navigable where it forms a border between two states and can support maritime commerce); *Rogers*, 723 F. Supp. 2d at 932 n.3 (citing *The Daniel Ball*, 77 U.S. 557, 563 (1870)); *Charnis*, 2009 WL 2581699, at *2 ("a body of water is 'navigable' when it forms the border between two states and is capable of supporting maritime commerce"); *White's Ferry Inc.*, 382 F. Supp. at 166 (river navigable where ferry could transport people between Maryland and Virginia); *Flecker v. Statue Cruises*, 129 A.3d 1129, 1135 (N.J. Super. Ct. Law Div. 2013) (Hudson River navigable because two states' boundaries meet in the middle of the River).

RTDI acknowledges the Eighth Circuit determined Table Rock Lake is not navigable for admiralty jurisdiction purposes in the only opinion that appears to have addressed the issue. *Edwards v. Hurtel*, 717 F.2d 1204, 1205 (8th Cir. 1983), *aff'd on reh'g*, 724 F.2d 689 (8th Cir.

11728761.1

1984). For this reason, RTDI identified *Edwards* in its Complaint (United States District Court for the Western District of Missouri No. 6:19-cv-05006-MDH, Doc. 2, ¶ 4) as authority that contradicts RTDI's claim that Table Rock Lake *is* a navigable waterway because it borders Missouri and Arkansas and is capable of supporting maritime commerce.

Respectfully, the *Edwards* opinion should not be followed because the decision on Table Rock Lake's navigability was based on judicially noticed "facts" that were not challenged at the district court level and was made without considering opposing affidavits concerning navigability. 717 F.2d at 1205. These judicially noticed "facts" include a determination that Table Rock Lake "has not been susceptible of use for commercial shipping and in fact has been used *exclusively* [emphasis added] for recreational activities." *Id.* Additionally, the district court accepted the "fact" that "there is no reasonable likelihood that Table Rock Lake will become or be made navigable in the near future." *Id.*

These "facts" are all contradicted by the 1967 Coast Guard memorandum and the 1978 Corps of Engineers Report, which suggests the district court was not provided with the memorandum or the Report (the Eighth Circuit's opinions do not reference either document). This court should follow the Coast Guard's and the Corps of Engineers' recommendations on Table Rock Lake's navigability when considered with the voluminous evidence presented with this brief that establishes vessels can and do freely navigate from the location where the July 19, 2018, incident occurred to locations in Arkansas on the west and east sides of Table Rock Lake and its tributaries.

**C.     The July 19, 2018, Incident Disrupted Maritime Commerce and Was Substantially Related to Maritime Activity.**

While the "nexus" requirement is of limited importance in determining admiralty jurisdiction, the July 19, 2018, incident involving Stretch Duck 7 nevertheless meets this

11728761.1

requirement. To that end, the incident was not only *likely* to disrupt maritime commerce, it *did* disrupt maritime commerce because (1) it involved a vessel carrying passengers on a sightseeing tour, (2) individuals in distress, and (3) efforts to rescue those individuals. The incident was also substantially related to maritime activity by virtue of the fact a commercial sightseeing tour on a waterway has traditionally been considered maritime activity. This court should assume jurisdiction over RTDI's, Branson Duck Vehicles', and Ripley Entertainment's limitation actions because the "locality" requirement and the "nexus" requirement for admiralty jurisdiction have both been met.

## II. RIDE THE DUCKS INTERNATIONAL HAS STANDING TO BRING A LIMITATION ACTION BECAUSE OF THE CONSIDERABLE INVESTMENT IT MADE IN STRETCH DUCK 7.

46 U.S.C. §§ 30501-30512 provide that a vessel owner's liability for personal injury or death that occurs on a "seagoing vessel[ or a] vessel used on lakes or rivers or in inland navigation" without the owner's privity or knowledge is limited to "the value of the vessel and pending freight." The law "was enacted 'to encourage investments in ships and their employment in commerce', so that 'the shipping interests of this country might not suffer in competition with foreign vessels.'" *In re Am. Milling Co.*, 270 F. Supp. 2d 1068, 1098 (E.D.Mo. 2003), *aff'd in part, rev'd in part*, 409 F.3d 1005 (8th Cir. 2005) (quoting *In re Marine Recreational Opportunities, Inc.*, 15 F.3d 270, 271 (2d Cir. 1994)). *See also In re The Trojan*, 167 F. Supp. 576, 578 (N.D. Cal. 1958) (Congress designed the Limitation of Liability Act "to encourage shipbuilding and to induce investment in the shipping industry").

11728761.1

Historically, the term "owner" was undefined but was nevertheless "given a broad construction so as to achieve the congressional intent to promote marine shipping."[7] *In re Am. Milling Co.*, 270 F. Supp. 2d at 1098. Courts have been liberal in construing the word "owner." *Flink v. Paladini,* 279 U.S. 59, 63 (1929); *Complaint of Nobles*, 842 F. Supp. 1430, 1437 (N.D. Fla. 1993) (quoting *Hammersley v. Branigar Org., Inc.*, 762 F. Supp. 950, 956 (S.D. Ga. 1991)) ("The word 'owner' in the Limitation Act is accorded a liberal, common sense interpretation in order to effectuate the intent of the act"); *Complaint of Chesapeake Shipping, Inc.,* 803 F. Supp. 872, 874 (S.D.N.Y. 1992). As a result, courts have determined a vessel ***owner*** for Limitation of Liability Act purposes is not restricted to the person or entity holding title and have extended the right to limit liability to "one who is a 'likely target' for liability claims predicated on his status as the person perhaps ultimately responsible for the vessel's maintenance and operation." *In re Marine Recreational Opportunities, Inc.*, 15 F.3d at 271 (quoting *In re Shell Oil Co.*, 780 F. Supp. 1086, 1089-90 (E.D. La. 1991)). Moreover, the term "owner" includes a vessel's ***prior owner*** where the prior owner's conduct that unquestionably occurred during that person's ownership period is alleged to have caused the accident at issue. *In re The Trojan*, 167 F. Supp. at 578. *See also In re Zebroid Trawling Corp.*, 428 F.2d 226, 228 (1st Cir. 1970).

In this case, the majority of the limitation claimants' liability allegations against RTDI focus on RTDI's activity during the time RTDI and its predecessors ***owned*** Stretch Duck 7.

---

[7] While § 30501 is titled "Definition," it does not contain an exhaustive list of individuals or entities that are considered vessel "owners." Instead, § 30501 is a revised version of 46 U.S.C. App. § 188, which identified the types of "charterers" the Limitation of Liability Act Cover. Section 30501's language in no way suggests the statute was intended to restrict the term "owner's" traditionally broad application.

Specifically, the limitation claimants seek to hold RTDI liable for its conduct in "designing, assembling, manufacturing, selling, supplying and distributing" a vessel that was supposedly defective for a variety of reasons and supposedly contained inadequate warnings and safety features.  (See the following Claims filed in United States District Court for the Western District of Missouri No. 6:19-cv-05006-MDH: Docs. 17, 18, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 48, 49, 52, 65.)  These allegations by definition center on RTDI's behavior while it **owned** Stretch Duck 7.  Similarly, the limitation claimants' aggravating circumstances and punitive damage allegations center on RTDI's response to recommendations following the *Miss Majestic* incident and RTDI's knowledge regarding Stretch Duck 7's seaworthiness **before** the boat was sold to Branson Duck Vehicles.  Again, the limitation claimants' emphasis is on RTDI's conduct during the time it **owned** Stretch Duck 7, which confers standing on RTDI to bring a limitation action.  *In re The Trojan*, 167 F. Supp. at 578 (limitation "clearly" available when "the alleged liability arose as the result of negligent conduct occurring before sale and during ownership").  *See also In re Zebroid Trawling Corp.*, 428 F.2d at 228.  Some of the claimants have even made specific allegations regarding RTDI's knowledge and conduct "***[p]rior to its sale** of Stretch Duck 07*" (emphasis added).  (See the following Claims filed in United States District Court for the Western District of Missouri No. 6:19-cv-05006-MDH: Doc. 22, ¶¶ 88-89; Doc. 24, ¶¶ 89-90; Doc. 25, ¶¶ 78-79; Doc. 26, ¶¶ 70-71; Doc. 27, ¶¶ 70-71; Doc. 28, ¶¶ 70-71; Doc. 29, ¶¶ 73-74; Doc. 30, ¶¶ 74-75; Doc. 31, ¶¶ 74-75; Doc. 33, ¶¶ 78-79; Doc. 34, ¶¶ 77-78; Doc. 35, ¶¶ 78-79; Doc. 36, ¶¶ 74-75; Doc. 37, ¶¶ 70-71; Doc. 38, ¶¶ 76-77; Doc. 39, ¶¶ 78-79; Doc. 40, ¶¶ 78-79; Doc. 41, ¶¶ 78-79; Doc. 42, ¶¶ 78-79; Doc. 43, ¶¶ 70-71.)

11728761.1

RTDI is aware there are courts that have held a prior vessel owner does not have standing to limit its liability. *In re Marine Recreational Opportunities, Inc.*, 15 F.3d at 270-71; *Calkins v. Graham*, 667 F.2d 1292, 1295 (9th Cir. 1982). In each of those cases, however, the courts determined the prior owner lacked standing to bring its limitation action because the prior owner did not at any time "have any money at all invested in the [vessel at issue]." *Calkins*, 667 F.2d at 1295. *See also In re Marine Recreational Opportunities, Inc.*, 15 F.3d at 270-71 (no evidence in opinion to suggest a prior owner who purchased a vessel at an unspecified time in early-1991 invested any money in the vessel before selling it on May 31, 1991).

To the contrary, RTDI and its merged predecessors invested significant time and money into Stretch Duck 7 over the course of nearly two decades before selling the Branson DUKW boat operations to Ripley Entertainment on December 1, 2017. Notably, RTDI and its merged predecessors incorporated various upgrades into Stretch Duck 7's design to increase buoyancy and to improve passenger safety. (New Duck Technology, Exhibit 8; RTDI Duck Development, Exhibit 9.) They even secured multiple patents on DUKW boat components and systems, to include the watertight "sea chest," the drive train, the steering knuckle boot, and the bearing housing. (Ride the Ducks International Stretch Duck Technical Overview, Exhibit 6.)

The extent of RTDI's maintenance and repair expenses devoted to Stretch Duck 7 between 2010 and 2017 is indicative of RTDI's investment in the vessel. Significantly, Stretch Duck 7's original cost for depreciation purposes was $175,000. (Financial Depreciation Inquiry, Exhibit 24.) Nevertheless, in 2010, RTDI invested $19,142.25 to upgrade Stretch Duck 7, a procedure that involved removing the vessel's hydraulic propulsion system and changing the system to a standard propulsion configuration containing a "sea chest." (Herschend Family Entertainment Job Master Documents, Exhibit 7; Job Status Inquiries, Exhibit 10.) Other

11728761.1

features associated with this upgrade included adding a propulsion box, a single speed transfer case, an engager setup, a reverse actuator, and drive shafts along with replacing the boat's hull floor to accommodate the new propulsion system. (Herschend Family Entertainment Job Master Documents, Exhibit 7.) The same year, RTDI invested another $7,481.57 to replace Stretch Duck 7's deteriorated metal and to paint the new metal. (Herschend Family Entertainment Job Master Documents, Exhibit 7; Job Status Inquiries, Exhibit 10.)

Over the next seven years, RTDI spent over $100,000 to repair and maintain Stretch Duck 7. (AssetWorks Documents, Exhibit 11.) Annual vessel inspection fees that were typically $300 were also paid to the Coast Guard to permit Stretch Duck 7's ongoing operation on Table Rock Lake. (Vessel Inspection User Fee Notification Letters, Exhibit 25.) In total, RTDI's monetary commitment toward Stretch Duck 7 in just the last decade was more than 75% of the boat's initial cost.

RTDI's considerable investment in Stretch Duck 7 requires that it be given the opportunity to limit its liability under §§ 30501-30512. *In re The Trojan*, 167 F. Supp. at 577-78. *See also Calkins*, 667 F.2d at 1295. To hold otherwise would improperly expose RTDI to greater liability than the liability that existed when it engaged in the conduct the limitation claimants criticize. *In re The Trojan*, 167 F. Supp. at 578.

## CONCLUSION

Virtually all of the evidence and testimony adduced in this case, including testimony from the limitation claimants' own witnesses, establishes that Table Rock Lake, including the area on the Long Creek tributary where the July 19, 2018, accident occurred, is a navigable waterway that is not only ***capable*** of supporting interstate commerce, but actually ***does*** support interstate commerce in its present capacity. Consequently, this Court is justified in exercising

22

11728761.1

subject matter jurisdiction over RTDI's, Branson Duck Vehicles', and Ripley Entertainment's limitation actions.  Further, RTDI has standing to pursue its claim as Stretch Duck 7's prior owner because the limitation claimants' allegations against RTDI are based on RTDI's conduct while it ***owned*** Stretch Duck 7 and because of the significant financial investment RTDI made in Stretch Duck 7 during that ownership period.

WHEREFORE, Ride the Ducks International, LLC, requests that the Court determine that it has admiralty jurisdiction over Ride the Ducks International, LLC's limitation action and for such other and further relief as the Court deems just and proper.

SANDBERG PHOENIX & von GONTARD P.C.

By:  */s/ Kevin P. Krueger*
Kevin P. Krueger, #33018
Andrew D. Ryan, #45924
Lawrence S. Hall, #63852
600 Washington Avenue - 15th Floor
St. Louis, MO  63101-1313
314-231-3332
314-241-7604 (Fax)
kkrueger@sandbergphoenix.com
aryan@sandbergphoenix.com
lhall@sandbergphoenix.com

*Ride the Ducks International, LLC's Attorneys*

## Certificate of Service

I hereby certify that on the 8th day of July 2019 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

*/s/ Kevin P. Krueger*

23